# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

SUPERIOR EDGE, INC.,            Civil No. 12-2672 (JRT/FLN)

         Plaintiff,

v.                    **MEMORANDUM OPINION
AND ORDER**

MONSANTO COMPANY and SITE-
SPECIFIC TECHNOLOGY
DEVELOPMENT GROUP, INC.,

         Defendants.

---

Walter Joseph Gates, III, **ATTORNEY AT LAW**, 510 Long Street, Suite 109, Mankato, MN 56001; and William G. Osborne, **WILLIAM G. OSBORNE, P.A.**, 1305 East Robinson Street, Orlando, FL 32801, for plaintiff.

Jennifer S. Kingston and Robert F. Epperson, Jr., **DOWD BENNETT LLP**, 7733 Forsyth Boulevard, Suite 1900, St. Louis, MO 63105; and Lucas Clayton, **FABYANSKE, WESTRA, HART & THOMSON, PA**, 800 LaSalle Avenue, Suite 1900, Minneapolis, MN 55402, for defendants.

This case arises out of a software development and license agreement between plaintiff Superior Edge, Inc. ("SEI") and defendant Monsanto Company ("Monsanto"). Pursuant to the agreement, SEI was to develop software for Monsanto to assist in Monsanto's seed sales initiatives. Prior to entering into the agreement with SEI, Monsanto had entered into a separate agreement with defendant Site-Specific Technology Development Group, Inc. ("SST") to help Monsanto achieve other facets of its seed sales initiatives.

After SEI and Monsanto began working together, conflict ensued regarding the parties' obligations under the agreement. As the relationship between Monsanto and SEI deteriorated, Monsanto and SST began developing software with the capabilities initially assigned to be created by SEI pursuant to the software development agreement. The current dispute centers generally around work performed by SEI for Monsanto for which it allegedly was not compensated, ownership of the software in question, whether SEI's software embodied the contracted for capabilities, whether the software was delivered on time, and whether Monsanto's expectations for and compensation of SEI's work were in accordance with the agreement.

SEI brings claims for breach of contract, fraud, conversion, deceptive trade practices, misappropriation of trade secrets, and tortious interference against Monsanto and SST. Monsanto and SST move to dismiss the claims against them (with the exception of the breach of contract claim alleged against Monsanto). SEI has also filed a motion for preliminary injunction, seeking to enjoin Monsanto from compelling arbitration. For the reasons explained below, the Court will grant Monsanto's motion to dismiss and grant in part and deny in part SST's motion to dismiss. The Court will also deny SEI's motion for preliminary injunction.

## BACKGROUND

## I.    THE RELATIONSHIP BETWEEN THE PARTIES

SEI is a software development business that specializes in creating customized computer-based marketing and sales software to meet the needs of its clients' particular

businesses.  (Compl. ¶ 1, 7, Oct. 19, 2012, Docket No. 1.)  Monsanto produces and sells commercial farm seed products.  (*Id.* ¶ 2.)

In 2008, Monsanto began to focus on developing a greater share of North America's seed market.  (*Id.* ¶ 9.)  To achieve this objective, Monsanto met with SEI to discuss possible software development that could improve Monsanto's customer service techniques and increase its sales.  (*Id.* ¶¶ 9-11.)  Monsanto indicated that the primary goal of SEI's work would be to enable Monsanto's sales force to make effective seed recommendations at the point of sale.  (*Id.* ¶ 14.)  That is, Monsanto wanted software that could obtain, organize, and present information about individual farmers and farms, such as ownership, size, crops, equipment used, and finances, that would allow the Monsanto sales representative to customize his or her sales pitch to the demands of the particular farmer.  (*Id.* ¶ 13.)

SEI intended to accomplish Monsanto's objectives using an application known as SalesEdge Accelerator ("SalesEdge").  (*Id.* ¶ 7.)  SalesEdge is SEI's primary system for improving clients' sales and it "permits . . . users to create personalized sales proposals – sometimes printed in binder or booklet form – using data from a wide range of sources with the data being tailored to the specific industry, seller and purchaser."  (*Id.*)  SEI licensed certain intellectual property from the Spangenberg Group in March 2009 that was essential to SEI's use of SalesEdge.  (*Id.* ¶ 7, Ex. A.)  SEI's licensing agreement with the Spangenberg Group granted SEI "an irrevocable, non-exclusive, non-transferable license."  (*Id.*, Ex. A at 2.)  Because SalesEdge was a key component of the software SEI

proposed to develop for Monsanto, Monsanto was involved in the negotiations between SEI and the Spangenberg Group to acquire the necessary licensing.  (*Id.* ¶ 7.)

Prior to entering into a relationship with SEI, Monsanto had contracted with SST, another software development company that specializes in business development and sales software with applications for the agricultural industry.  (*Id.* ¶ 3.)  SEI was aware of Monsanto's relationship with SST.  (*Id.*, Ex. B at 45.)

## II.    THE AGREEMENT

On August 7, 2009, Monsanto and SEI executed a Software Development and License Agreement ("the Agreement") with an effective date of March 1, 2009.  (*Id.* ¶ 21, Ex. B.)  The Agreement stated that "Monsanto desires to engage SEI to tailor and/or customize SEI's SalesEdge Accelerator software, develop new capabilities and provide services for the purpose of enhancing Monsanto's sales execution."  (*Id.*, Ex. B at 11.) The Agreement contained a Development Plan

> which include[d] initial requirements, specifications, features and functionalities of the Monsanto Premium Products,[1] a general overview and timetable for development and implementation of the SEI Technology, schedules for deliverables, test protocols and procedures, development objectives, and assumptions regarding ongoing contributions and research activities.

(*Id.*, Ex. B at 19.)  The Development Plan, attached as Exhibit A to the Agreement, set forth in great detail the objectives of Monsanto's relationship with SEI and the parties'

---

[1] Monsanto Premium Products include, among other technology, software created, developed, or invented by SEI having application to or solutions for Monsanto's seed production recommendations.  (Compl., Ex. B at 15.)  Monsanto Premium Products also include any of SEI's improvements to such software.  (*Id.*)

obligations. (*Id.*, Ex. B at 42-49.) In particular, the Development Plan defined the deliverables – the proposed features and functionality of the Monsanto Premium Product – that SEI was responsible for developing. (*Id.*, Ex. B at 44-49.) For example, one deliverable required SEI's software to "provide the ability to segment [Monsanto's] grower market against a defined set of indexes," which would "provide[] Monsanto with the capability of identifying and scoring prospective purchasers of Monsanto products." (*Id.*, Ex. B at 44.) For each deliverable, the Development Plan set forth the timeline for SEI to meet different milestones and also provided the metrics for measuring the adequacy of the deliverable. (*Id.*, Ex. B at 44-49.) Of relevance to the instant motions, SEI agreed to deliver "Grower Solutions" that would enable the sales person to generate a form that combined product and service recommendations, prepared quotes for those products and services, and "[p]roduce[d] a highly professional, branded document tailored for a customer/prospect." (*Id.*, Ex. B at 44.)

The Agreement allowed for the potential modification of the Development Plan during the Development Period by a Development Management Team, comprised of three Monsanto and three SEI representatives, stating:

> From time to time during the Development Period,[2] the Development Management Team shall review the Development Plan then in effect, and may make changes to the Development Plan as reasonably necessary to ensure that development objectives are appropriate and are achievable within the desired timeframes, or to incorporate any amendment to the development objectives that is proposed by Monsanto or SEI and approved [by the Development Management Team.]

---

[2] The Development Period extended from March 1, 2009 to August 31, 2012, unless earlier terminated or extended as provided elsewhere in the Agreement. (Compl., Ex. B at 13.)

(*Id.*, Ex. B at 19-20.) The Agreement provided that the Development Management Team would meet at least quarterly and could alter the Development Plan only by unanimous vote. (*Id.*, Ex. B at 20-21.) The Development Plan was intended to be managed through an "agile methodology." (*Id.*, Ex. B at 42.) Under the agile methodology, although the requirements of SEI's work were defined within the Development Plan it was "understood that they are general in nature. As the project moves through its various phases it is understood that a variety of factors will impact the project. The Agile methodology puts a process in place to adjust and adapt to these factors. . . . With the Agile approach priorities and deliverables are refined and adjusted as discoveries are made during the project." (*Id.*)

Pursuant to the Agreement, SEI granted certain rights to Monsanto with respect to SalesEdge and related intellectual property. (*Id.*, Ex. B at 11.) Specifically, SEI granted Monsanto an exclusive license for all software developed and improved by SEI with applications to, among other areas, Monsanto's seed production recommendations. (*Id.*, Ex. B at 15, 21-22.) Additionally, the Agreement provided that "[r]egardless of inventorship, any Intellectual Property associated with the Monsanto Premium Products . . . that is developed under this Agreement will be assigned to Monsanto. . . . SEI will be entitled to receive a limited, royalty-free license to use the Intellectual Property associated with the Monsanto Premium Products." (*Id.*, Ex. B at 25.)

The Agreement provided for three types of compensation: exclusivity payments, development fees, and user fees. (*Id.* ¶¶ 23-25, 27-29.) Monsanto agreed to pay SEI an

exclusivity fee of approximately $1 million per year until September 1, 2012, in consideration for the exclusive licenses granted by SEI. (*Id.*, Ex. B at 23-24.) The development fees were "[i]n consideration of SEI's services under the Development Plan," whereby Monsanto agreed "to pay SEI for time and material costs incurred during the Development Period." (*Id.*, Ex. B at 24.) The Agreement called for Monsanto to pay SEI an initial $500,000 development fee upon the execution of the Agreement and an additional $500,000 on September 15, 2009. (*Id.*) After Monsanto had paid the first $1 million in development fees, the Agreement provided that "SEI shall submit invoices on a monthly basis evidencing line item detail for time and materials costs for the development during the period up to August 31, 2010. . . . [C]umulative payments to SEI from Monsanto shall not exceed One Million, Five Hundred Thousand Dollars (US $1,500,000) for Development Fees in the period through August 31, 2010." (*Id.*) After September 1, 2010, Monsanto was to pay SEI monthly development fees "upon receipt and acceptance of an invoice evidencing line item detail of costs from SEI by Monsanto." (*Id.*) Development fees after September 1, 2010, were not to exceed $1 million in any fiscal year. (*Id.*) Finally, Monsanto was responsible for a monthly user fee that was based upon the number of authorized users of SEI's software. (*Id.*, Ex. B at 24, 50.)

The Agreement contained multiple bases for its termination. First, either party could terminate the Agreement (with the exception of, among other sections, the assignment of intellectual property rights and confidentiality provisions)

> in the event the other party has (a) breached a provision of this Agreement and such breach has materially affected the non-breaching party's ability to obtain the rights or benefits accruing to the non-breaching party under this

Agreement, or (b) defaulted in the performance of any of its obligations hereunder, and, in each instance, such default has continued past the applicable cure period after notice thereof was provided . . . .

(*Id.*, Ex. B at 34.)  The Agreement also allowed Monsanto to terminate the Development Period upon "at least one hundred and twenty (120) days prior written notice if SEI fails to complete any of the Development Milestones." (*Id.*, Ex. B at 19-20.)

Finally, with respect to litigation, the Agreement provided that Missouri law would govern "any dispute arising from the performance or breach" of the Agreement. (*Id.*, Ex. B at 38.)  The Agreement also contained an arbitration clause, providing that "[a]ny dispute under this Agreement that is not settled by mutual consent shall be finally settled by binding arbitration." (*Id.*, Ex. B at 35, 55-57.)

## III.    BATCH PRODUCTION

In 2009 and 2010, SEI's development team devoted substantial time and effort to the Monsanto project. (*Id.* ¶ 33.)  SEI conducted at least eleven software demonstrations for Monsanto personnel, tailored SalesEdge to perform advanced seed selection application, provided Monsanto with access to the software as it developed, and attended meetings with the Development Management Team and Monsanto staff. (*Id.*)

In 2010, SEI approached Monsanto with ideas to enhance the quality of Monsanto's sales proposals, and provided Monsanto with several prototypes. (*Id.* ¶ 39.)  Monsanto approved of one of the sales proposal prototypes which eventually became known as IntelliScans. (*Id.* ¶ 40.)  IntelliScans are individualized sales proposal booklets that are given to potential Monsanto customers and contain information about the

customer's farm and seed product needs.  SEI intended to develop web-based software that would allow Monsanto salespeople to generate, print, and ship IntelliScans in the field, but had not developed this capability when it presented the prototypes to Monsanto. (*Id.* ¶ 41.)  A Monsanto executive, however, requested immediate, large-scale production of IntelliScans.  (*Id.* ¶ 40.)

To accommodate Monsanto's request for the production of IntelliScans, SEI came up with a "batch" or "interim" solution.  (*Id.* ¶ 42.)  This solution was "a centralized, batch method for producing, printing, and shipping the documents that could be used in the interim until the web application was launched."  (*Id.*)  SEI entered data compiled by SST and Monsanto into the IntelliScans, then printed and shipped the forms to Monsanto employees who in turn provided them to dealers and farmers.  (*Id.*)  The batch processing solution "was intended to be a temporary solution to help support Monsanto's desire to obtain as many IntelliScans as soon as possible and thereby maximize the impact on sales.  Both parties understood that the batch method was not the end game."  (*Id.* ¶ 43.) Monsanto "never expressed or implied that [it] expected that SEI would perform such work without additional compensation or for no compensation."  (*Id.* ¶ 40.)

During 2010 and 2011 SEI produced a total of 2,771 IntelliScans.  (*Id.* ¶ 44.)  SEI paid for the printing and distribution costs of the IntelliScans after Monsanto refused to do so.  (*Id.*)  SEI incurred over $1.5 million in costs related to the IntelliScans, including costs for the time of its personnel "that were devoted to developing, auditing, reporting[,] testing[,] and other work."  (*Id.*)

During this time period, Monsanto insisted that SEI describe its technology and methods to SST. (*Id.* ¶ 47.) Monsanto also requested SEI's source code, which SEI refused to provide. (*Id.*) Instead, SEI offered to allow Monsanto representatives to examine the source code at SEI headquarters, which Monsanto declined to do. (*Id.*)

## IV.    FURTHER DEVELOPMENT OF SALESEDGE

In February 2011 SEI met with Monsanto and demonstrated the capabilities of the SalesEdge software with respect to seed selection and IntelliScan creation. (*Id.* ¶ 49.) A Monsanto executive indicated that he was "extremely impressed with SEI's software." (*Id.*) On April 19, 2011, SEI and Monsanto held a regular monthly Development Management Team meeting. (*Id.* ¶ 51.) The parties discussed user acceptance testing, essentially final criteria that would be used to assess whether SalesEdge was ready for launch to Monsanto salespeople. (*Id.*) Because Monsanto wanted to launch the SalesEdge pilot at the June 2011 sales meeting, SEI indicated that user acceptance testing would need to begin by May 16. (*Id.*) At the meeting the parties also discussed the need to revise the Development Plan to bring its objectives into conformity with the actual current development. (*Id.*)

That same day, an SEI representative met with a Monsanto executive to discuss issues with the Agreement's fee structure. (*Id.* ¶ 52.) Specifically, the SEI representative indicated that because SEI had only received an exclusivity fee, it was essentially subsidizing the development of software for Monsanto. (*Id.*) The Monsanto executive

indicated the he would consider shifting money from exclusivity to development to address SEI's concerns.  (*Id.*)

In April and May 2011, SEI repeatedly requested final criteria for user acceptance testing from Monsanto.  (*Id.* ¶ 53.)  Monsanto did not respond to SEI's requests and also did not respond to SEI's circulation of its own set of final criteria.  (*Id.*)

During the same time period, SEI again expressed concerns about the fee structure.  (*Id.* ¶ 58.)  Despite the dispute over fees, SEI continued to develop SalesEdge for launch at the June meeting, and received "overwhelmingly positive feedback" from Monsanto.  (*Id.* ¶¶ 54, 59.)  Based on this feedback, SEI believed SalesEdge was acceptable to Monsanto.  (*Id.* ¶ 55.)  In May, however, one Monsanto executive claimed to have experienced a hardware issue while running SalesEdge, which resulted in the executive seeing only a blue screen on her computer.  (*Id.* ¶¶ 56-57.)  SEI spent $20,000 devising a solution to the blue screen problem, and Monsanto never again complained of that issue.  (*Id.* ¶ 57.)  SEI twice demonstrated SalesEdge at user acceptance training sessions, and continued to provide Monsanto with access to updated versions of the software.  (*Id.* ¶ 59.)

Monsanto decided not to launch the SalesEdge software at the June 2011 sales meeting and did not inform SEI when the meeting would occur.  (*Id.* ¶ 60.)  Monsanto indicated that its reason for not launching the software was the blue screen issue.  (*Id.* ¶ 61.)  Instead, Monsanto appeared to be moving forward with software claimed to be developed by SST.  (*Id.* ¶ 62.)  In May 2011, SST published a statement and distributed written materials to the general public and the agriculture industry indicating that

IntelliScan and IntelliSeed software had been created through the joint efforts of Monsanto and SST.  (*Id.*)

## V.    TERMINATION OF THE AGREEMENT

In June and July of 2011, in response to SEI's continuing issues with fees, Monsanto indicated that it believed Development Fees were subject to a yearly cap under the Agreement and that User Fees were also limited.  (*Id.* ¶ 62.)  Monsanto also denied any obligation to pay SEI for costs incurred during batch processing.  (*Id.*)  In response, SEI provided Monsanto with a chart setting forth SEI's completion of various deliverables under the Agreement.  (*Id.* ¶ 63, Ex. C.)

On August 29, 2011, Monsanto accused SEI of failing to provide a functional web-based application of the SalesEdge software by the June 2011 national sales meeting.  (*Id.* ¶ 63.)  One month later, without prior notice to SEI or an opportunity to cure, Monsanto terminated the Agreement under both termination provisions described above.  (*Id.* ¶ 64.)

After the termination, Monsanto contacted the Spangenberg Group and obtained licenses to use the Group's patented technology.  (*Id.* ¶ 66.)  In early 2012, Monsanto filed an application for a trademark on "Fieldscripts," a software product allegedly developed by Monsanto and SST, which SEI claims is the same product developed by SEI under the Agreement.  (*Id.* ¶ 67.)

On January 30, 2012, Monsanto paid SEI $100,000, and claimed that it was the final payment of all amounts due to SEI under the Agreement.  (*Id.* ¶ 65.)

On October 19, 2012, SEI filed a complaint against Monsanto and SST. SEI's complaint brings claims for breach of contract against Monsanto, as well as claims for fraud, conversion, deceptive trade practices, misappropriation of trade secrets, and tortious interference against both defendants. The case is now before the Court on defendants' motions to dismiss and SEI's motion for preliminary injunction.

## ANALYSIS

## I.     MOTIONS TO DISMISS

### A.     Standard of Review

In reviewing a motion to dismiss brought under Rule 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "'claim to relief that is plausible on its face.'" *See, e.g.*, *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility" and therefore must be dismissed. *Id.* (internal quotation marks omitted). Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). Therefore, to survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

### B. Choice of Law

As an initial matter, the Court must determine whether Missouri law applies to SEI's claims against Monsanto due to the Agreement's choice of law clause, which provides that Missouri law governs "th[e] Agreement and any dispute arising from the performance or breach" of the Agreement.

"In determining whether a choice of law provision in the parties' agreement will be given effect, a federal court sitting in diversity looks to the choice of law principles of the forum state, in this case Minnesota." *Fla. State Bd. of Admin. v. Law Eng'g & Envtl. Servs., Inc.*, 262 F. Supp. 2d 1004, 1012 (D. Minn. 2003); *see also Ceres Envtl. Servs., Inc. v. Arch Specialty Ins. Co.*, 853 F. Supp. 2d 859, 865-66 (D. Minn. 2012). Minnesota courts generally recognize choice of law clauses. *See Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1392 (8th Cir. 1997); *Milliken & Co. v. Eagle Packaging Co.*, 295 N.W.2d 377, 380 n.1 (Minn. 1980). Therefore, where the parties have acted in good faith, Minnesota courts enforce choice of law clauses and apply the substantive law agreed to by the parties. *See Hagstrom v. Am. Circuit Breaker Corp.*, 518 N.W.2d 46, 48 (Minn. Ct. App. 1994).

It is clear, and the parties agree, that pursuant to the choice of law clause Missouri law applies to the breach of contract claim in Count I. However, the Court must determine whether the choice of law clause also governs SEI's tort claims against

Monsanto. In some circumstances, choice of law clauses can control which jurisdiction's law will govern tort claims in addition to breach of contract claims arising out of the agreements of which the clauses are a part. *See Nw Airlines*, 111 F.3d at 1392. Where a plaintiff's tort claims "are closely related to the interpretation of the contract[] and fall within the ambit of the express agreement," those tort claims are also properly subject to the contract's choice of law clause. *Id.* In other words, "under Minnesota law, if analysis of the claims connected to a contract involves interpretation of the contract, then the forum will apply the contractual choice-of-law provisions to the tort claims." *Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1061 (8th Cir. 2003); *see Warren E. Johnson Cos. v. Unified Brand, Inc.*, 735 F. Supp. 2d 1099, 1104-05 (D. Minn. 2010).[3]

The Court finds that the choice of law clause in the Agreement governs some, but not all, of SEI's claims against Monsanto. The clause states that it governs "any dispute arising from the performance or breach" of the Agreement. With the exception of

---

[3] In arguing that Missouri law applies to some of SEI's claims, Monsanto focuses on whether the substantive law of Missouri and Minnesota law conflict in an outcome determinative manner. In the absence of a contractual choice of law clause, Minnesota courts apply the "better law" methodology adopted in *Milkovich v. Saari*, 203 N.W.2d 408 (Minn. 1973). However, where, as here, "the parties['] express contractual provisions have designated that the laws of a particular state shall govern disputes arising under the agreement, Minnesota courts have applied the substantive law of the designated state without reference to the *Milkovich* factors." *Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 679 (D. Minn. 1986) (citing *Medtronic, Inc. v. Gibbons*, 684 F.2d 565, 567-68 (8th Cir. 1982)). Because a choice of law clause governs disposition of some of SEI's claims, the Court need not undertake its own choice of law analysis, and need not consider whether the substantive law of the state chosen by the clause conflicts with the law of the forum in an outcome determinative manner. *See, e.g.*, *Ceres Envtl. Servs.*, 858 F. Supp. 2d at 866 (applying New York law due to a choice of law clause without undertaking a choice of law analysis); *Fla. State Bd. of Admin.*, 262 F. Supp. 2d at 1014 (applying Florida law due to a choice of law clause without undertaking a choice of law analysis).

tortious interference, SEI's claims against Monsanto directly relate to Monsanto's performance or breach of the Agreement, and therefore are governed by the choice of law clause. *See Nw Airlines*, 111 F.3d at 1389 (applying a choice of law clause to plaintiff's claims for negligent performance, misrepresentation, deceptive trade practices, and unjust enrichment because the claims stemmed from the defendant's alleged failure to perform under the contract). SEI's allegation that the parties formed a separate contract for batch processing will require the Court to interpret the Agreement and determine whether batch processing was within its scope. SEI's fraud claim is also intertwined with the Agreement, as it alleges that Monsanto did not perform under the contract by refusing to accept SEI's work. Therefore, analysis of SEI's fraud claim necessarily involves determining what performance was demanded under the Agreement. *See Evangelical Lutheran Church in Am. Bd. of Pensions v. Spherion Pac. Workforce LLC*, Civ. No. 04-4791, 2005 WL 1041487, at *2 (D. Minn. May 4, 2005) (applying a choice of law clause to fraud claims that were "closely related to the interpretation of the contract," requiring analysis of whether the defendant had provided "the contracted-for software and services"). Similarly, to evaluate whether Monsanto converted SEI's property, engaged in deceptive trade practices, or misappropriated SEI's trade secrets will require the Court to interpret the scope of the confidentiality provision and the assignment of intellectual property rights and licenses under the Agreement. SEI's tortious interference claim, however, is not intertwined with the Agreement. SEI's tortious interference claim arises out of the agreement that Monsanto entered into with the Spangenberg Group after Monsanto had terminated the Agreement. SEI alleges that Monsanto's agreement

interfered with SEI's relationship with the Spangenberg Group. Assessing whether that conduct constituted tortious interference will not require the Court to interpret the Agreement, but instead is a cause of action that could have existed even in the absence of the Agreement. Therefore, the Court will apply Missouri law to SEI's claims against Monsanto for breach of contract, fraud, conversion, deceptive trade practices, and misappropriation of trade secrets, and Minnesota law to SEI's claim for tortious interference.

SEI relies primarily upon *Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683 (8th Cir. 2001), in support of its argument that the Agreement's choice of law clause does not govern SEI's tort claims. In *Inacom*, the Eighth Circuit concluded that a choice of law provision stating that the contract "shall be governed and construed in accordance with the law of the State of Illinois," did not apply to a related fraudulent concealment claim. *Id.* at 687-88. The court reasoned that "[t]he narrow contractual language that the [contract] is to be governed and construed by Illinois law simply does not address the entirety of the parties' relationship," and that the clause did not demonstrate the parties' intent to have their tort claims governed by Illinois law. *Id.* at 687. *Inacom* is distinguishable from the present case. First, the tort claim in *Inacom* did not relate to contractual performance, but instead related to fraudulent concealment preceding the contract's formation. *Id.* at 685-86; *see also Smith v. Genetic Depot, Inc.*, Civ. No. 11-273, 2013 WL 627065, at *8-9 (D. Minn. Feb. 20, 2013) (declining to apply a narrow choice of law clause to underlying torts that related to the formation, not the performance of the agreement). Second, the clause at issue in *Inacom* was narrower than the clause

found in the Agreement. In *Inacom*, the choice of law clause stated that the "Agreement shall be governed by and construed in accordance with the law of the State of Illinois, as applied to contracts made and to be performed solely within such state." 254 F.3d at 687. Here, on the other hand, the choice of law clause provides that Missouri law will apply not only to the Agreement, but also to "any dispute arising from the performance or breach" of the Agreement.

Finally, Monsanto seems to suggest that Missouri law should also apply to SEI's claims brought against SST. As support, Monsanto relies upon *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438 (Minn. Ct. App. 2001). In *Medtronic*, the court analyzed an employment contract between Medtronic and a former employee to determine whether a non-compete clause prohibited the former employee from working for a new company. *Id.* at 445-46. The new company was a party to the litigation, but not to the employment contract. *Id.* at 454. The court determined that Minnesota law applied, in part because the employment agreement contained a choice of law provision selecting Minnesota law, even though the new employer was not a party to the contract. *Id.* at 456. *Medtronic* is distinguishable, however, because the non-party to the contract specifically challenged the enforceability of the agreement not to compete. Here, SST has not sought to litigate the terms or enforceability of the Agreement. Furthermore, the Eighth Circuit has clearly held that contractual choice of law clauses do not govern entities that did not sign and are not bound by the contract containing the clause. *See*

*Holden Farms, Inc.*, 347 F.3d at 1063-64. Therefore, the Court finds that the choice of law provision in the Agreement is not binding upon SST.[4]

Because the Agreement is not binding upon SST, the Court must determine what substantive law applies to SEI's claims brought against SST. SST itself has not raised any choice of law issue with respect to SEI's claims against it, and relies almost exclusively on Minnesota law in support of its motion to dismiss. "When parties acquiesce to the application of a particular state's law, courts need not address choice of law questions." *Asp v. Toshiba Am. Consumer Prods., LLC.*, 616 F. Supp. 2d 721, 726 (S.D. Ohio 2008) (citing *GBJ Corp. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1085 (6th Cir. 1998)). Because SST has acquiesced to the application of Minnesota law, the Court declines to undertake a sua sponte choice of law analysis, and will apply Minnesota law to the claims brought against SST. *See In re Korean Air Lines Disaster*, 932 F.2d 1475, 1495 (D.C. Cir. 1991) ("Unlike jurisdictional issues, courts need not address choice of law questions sua sponte."); *Sneyd v. Int'l Paper Co.*, 142 F. Supp. 2d 819, 823 n.2 (E.D.

_____

[4] SEI argues that because the choice of law clause is not binding upon SST, the Court cannot apply the choice of law clause to SEI's claims brought against Monsanto. SEI's argument misses the mark. Whether the choice of law clause is binding upon SST is not relevant to determining whether the clause is binding upon SEI and Monsanto, the parties to the Agreement. Contrary to SEI's unsupported contention, there is no legal principle that prohibits the Court from applying the substantive law of different states to different defendants in a single case. *See Holden Farms, Inc.*, 347 F.3d at 1061-64 (determining that a choice of law clause applied to some, but not all, defendants and consequently applying North Carolina, Iowa, and Minnesota law to different defendants in a single case). SEI also seems to argue that because neither Monsanto nor SST have challenged the Court's exercise of personal jurisdiction over them, that the Court must apply Minnesota law to all claims in the case. Personal jurisdiction and choice of law, however, present distinct inquiries. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 481-82 (1985). Therefore, simply because the Court has personal jurisdiction over Monsanto in Minnesota does not require that the Court apply Minnesota law.

Mich. 2001) ("Because all parties acquiesce in the application of the substantive law of Michigan, the Court will apply Michigan law and need not conduct a choice-of-law analysis sua sponte.").[5]

### C.    Count II[6] – Breach of Contract (Batch Processing)

In Count II, SEI alleges that a contract separate from the Agreement was formed between SEI and Monsanto during the course of their relationship. Pursuant to this alleged contract, Monsanto requested that SEI create and distribute numerous copies of SEI's IntelliScan product and deliver them to Monsanto. (Compl. ¶ 87.) SEI alleges that it produced these copies and they were accepted by Monsanto. (*Id.*) SEI further alleges that it tracked the costs of time and material for producing and distributing these copies, and submitted invoices for its costs. (*Id.*) SEI alleges that Monsanto breached the contract when it refused to pay the invoices. (*Id.* ¶ 88.) SEI claims that it is owed over $1.5 million. (*Id.* ¶¶ 90-91, Ex. D.)

To state a claim for breach of contract under Missouri law, a plaintiff must allege: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and

---

[5] Additionally, applying Minnesota law in this case is consistent with this Court's approach of applying the law of the forum in the absence of an outcome determinative conflict between the substantive laws of interested states. *See Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, 715 F. Supp. 2d 871, 875 (D. Minn. 2010). Here SST has failed to identify any conflict between the substantive law of Minnesota and any other potentially interested state that would control the outcome of this case.

[6] As explained above, Count I of SEI's complaint alleges that Monsanto breached the Agreement. Monsanto has not moved to dismiss Count I.

(4) damages suffered by the plaintiff." *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 103 (Mo. 2010). To form a contract, the parties must mutually assent to its terms. *Bldg. Erection Servs. Co. v. Plastic Sales & Mfg. Co.*, 163 S.W.3d 472, 477 (Mo. Ct. App. 2005). In order to have mutuality of agreement the parties must have "a meeting of the minds to the essential terms of a contract." *Ketcherside v. McLane*, 118 S.W.3d 631, 635 (Mo. Ct. App. 2003).

The Court finds that SEI has failed to allege the existence of a contract regarding batch processing that was separate from the original Agreement. The Agreement's Development Plan required SEI to develop software capable of producing the equivalent of IntelliScans. Specifically, the Development Plan called for development of software that would enable a Monsanto salesperson to generate a document including product and service recommendations and prices that was tailored for a particular customer or prospect. SEI's complaint indicates that the Agreement contemplated the production of IntelliScans by describing the batch processing arrangement as a method for producing IntelliScans "that could be used in the interim until the web application was launched" and that batch processing "was intended to be a temporary solution." (Compl. ¶ 42.) In other words, SEI admits that the batch processing arrangement was a "solution," albeit a temporary one, for deliverables contemplated by the Development Plan. Although the Development Plan did not call specifically for the printing of IntelliScans by SEI, the Agreement specified that it governed SEI's development of software under an agile methodology, whereby "priorities and deliverables are refined and adjusted as discoveries are made during the project." (*Id.*, Ex. B at 42.) Moreover, the Agreement appears to

have contemplated payment for batch processing by requiring Monsanto "to pay SEI for time and material incurred during the Development Period." (*Id.*, Ex. B at 24.)

That the batch processing was not a separate contract is confirmed by the lack of definite terms alleged in SEI's complaint. A "contract's essential terms must be certain or capable of certain interpretation." *Fedynich v. Massood*, 342 S.W.3d 887, 891 (Mo. Ct. App. 2011). "A contract is sufficiently definite if it contains matter which would enable the court under proper rules of construction to ascertain its terms, including consideration of the general circumstances of the parties and if necessary relevant extrinsic evidence." *Id.* (internal quotation marks omitted). Where, however, "the terms of agreement are unduly uncertain and indefinite," no contract is formed. *Bldg. Erection Servs.*, 163 S.W.3d at 477.

SEI's complaint does not allege that the parties reached an understanding about the essential terms of any purported batch processing contract ancillary to the Agreement. In particular, with respect to payment, SEI's complaint alleges only that Monsanto "never expressed or implied that [it] expected that SEI would perform such work without additional compensation or for no compensation." (Compl. ¶ 40.) This negative statement of SEI's perception of Monsanto's intentions is insufficient to demonstrate the plausible existence of a separate contract. *See Gateway Exteriors, Inc. v. Suntide Homes, Inc.*, 882 S.W.2d 275, 279 (Mo. Ct. App. 1994) ("Whether a contract is made and, if so, what the terms of the contract are, depend upon what is actually said and done and not upon the understanding or supposition of one of the parties."). That the parties did not discuss a fee structure indicates that SEI has not alleged a separate agreement for batch

processing. The Court will therefore dismiss Count II of SEI's complaint. Because the Court finds that any batch processing dispute is properly resolved under the terms of the original Agreement, the Court will allow SEI twenty-one days in which to file an amended complaint adding any allegations stemming from batch processing to its claim for breach of contract in Count I.

### D.    Fraud

#### 1.    Count III – Against Monsanto

SEI appears to raise two fraud claims against Monsanto. First, SEI alleges that in 2011 Monsanto falsely represented that it was satisfied with SEI's progress on SEI's software development efforts. (Compl. ¶¶ 93-94.) Relatedly, the complaint suggests that Monsanto committed fraud when it did not inform SEI that the work being done by SEI was not in complete fulfillment of SEI's obligations under the Agreement. (*Id.* ¶ 93.) Second, SEI alleges that Monsanto falsely represented that SEI's work product was defective, that SEI never met the required deadlines under the Agreement, and that SEI misrepresented its capabilities to perform under the Agreement. (*Id.* ¶ 94.)

To state a claim for fraud under Missouri law, a plaintiff must allege:

(1) a representation; (2) its falsity; (3); its materiality; (4) the speaker's knowledge of its falsity, or ignorance of the truth; (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury.

*Trimble v. Pracna*, 167 S.W.3d 706, 712 n.5 (Mo. 2005). A fraud claim can only be maintained in addition to a breach of contract claim if it arises "from acts that are separate and distinct from the contract." *O'Neal v. Stifel, Nicolaus & Co.*, 996 S.W.2d 700, 702 (Mo. Ct. App. 1999). "The mere failure to perform a contract cannot serve as the basis of tort liability unless the breach itself is an independent tort." *Ryann Spencer Grp., Inc. v. Assurance Co. of Am.*, 275 S.W.3d 284, 290 (Mo. Ct. App. 2008). Plaintiffs therefore cannot convert a breach of contract claim into a tort claim unless "the duty breached is exclusively incidental to the contract." *Deschler v. Brown & Williamson Tobacco Co.*, 797 F.2d 695, 697 (8th Cir. 1986).

The Court finds that SEI's fraud claim is duplicative of its breach of contract claim in Count I, and that SEI alleges no duty independent from Monsanto's obligations under the Agreement. SEI's fraud claims as pled seek to challenge Monsanto's performance under the Agreement. Specifically, the fraud claims relate to Monsanto's initial acceptance and then rejection of SEI's work product, and whether that rejection was consistent with the terms of the Agreement. Additionally, to the extent SEI argues it was induced to continue producing software based on Monsanto's promises to perform its own contractual obligations cannot support a claim for fraud because any such inducement was contemplated by the terms of the Agreement. *See Anglin Eng'g Co. v. J.E. Barry Co.*, 912 S.W.2d 633, 639 (Mo. Ct. App. 1995) (concluding that the element of reliance was lacking because "[plaintiff]'s inducement to continue to prepare the drawings was based upon its contract with [defendant], not upon additional assurances of payment given during the course of the contractual relationship"). Because SEI does not

allege a fraud claim against Monsanto arising from acts that are separate and distinct from the Agreement, the Court will dismiss the fraud claim.[7]

In its briefing, SEI concedes that its fraud claims against Monsanto based on conduct occurring while the Agreement was still in effect are barred. Instead, SEI seems to be abandoning its fraud claims as pled and suggesting that its fraud claim arises solely out of Monsanto's use of SEI's products after termination of the Agreement and its representations to the public that Monsanto owned those products. Because any such fraud claim fails on the merits, the Court need not determine whether such a claim was pled in SEI's complaint or whether such a claim is in fact separate from SEI's breach of contract claim. First, under this version of the fraud claim, SEI has failed to allege the first element of a fraud claim because there was no representation. Monsanto's actual use of SEI's product does not constitute a communication. *See Wagner v. Mortg. Info. Servs., Inc.*, 261 S.W.3d 625, 639-40 (Mo. Ct. App. 2008) (requiring either a direct or indirect communication of the information in order to constitute a representation). Furthermore, Monsanto did not communicate to SEI that Monsanto owned the products, nor did Monsanto provide that information to a third party with the intent that SEI would be so informed. *See id*. Second, a fraud claim requires that the plaintiff be ignorant of the falsity of the representation. *See Trimble*, 167 S.W.3d at 712 n.5. Here, SEI alleges that it knew immediately that Monsanto's claim of ownership was false, therefore even if

---

[7] Because the Court concludes that SEI's fraud claim fails to allege a duty independent of the breach of contract, the Court need not consider whether the related economic loss doctrine may also apply in this circumstance to bar SEI's fraud claim. *See, e.g.*, *Autry Morlan Chevrolet, Cadillac, Inc. v. RJF Agencies, Inc.*, 332 S.W.3d 184, 192 (Mo. Ct. App. 2010).

Monsanto had made any representations to SEI, those representations could not support a claim for fraud. Therefore, to the extent SEI's fraud claim can be construed as involving Monsanto's false claims to ownership of SEI's software, the Court will dismiss the claim.

### 2. Count IV – Against SST

SEI alleges that SST committed fraud when it "cooperated with Monsanto in acquiring as much knowledge about SEI's technology as possible and in at least May of 2011, began to represent the product as its' own work product and as the joint property of SST and Monsanto." (Compl. ¶ 101.)

To succeed ultimately on its fraud claim against SST, SEI must prove: (1) a false representation by SST of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce SEI to act in reliance thereon; (4) that the representation caused SEI to act in reliance thereon; and (5) that SEI suffered pecuniary damages as a result of the reliance. *See Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).

The Court finds that SEI fails to state a claim for fraud against SST. First, SEI has not alleged that SST made any false representation to SEI. *See, e.g.*, *Flynn v. Am. Home Prods. Corp.*, 627 N.W.2d 342, 350 (Minn. Ct. App. 2001) (explaining that Minnesota common law requires a "direct communication" to support a claim of fraudulent misrepresentation). Second, SEI has failed to allege any reliance. A plaintiff's detrimental reliance "is an essential element of a common law fraud claim." *Popp*

*Telecom, Inc. v. Am. Sharecom, Inc.*, 361 F.3d 482, 491 (8th Cir. 2004); *see also Nilsen v. Farmers' State Bank of Van Hook, N.D.*, 228 N.W. 152, 153 (Minn. 1929). Actual reliance "means that the plaintiff took action, resulting in some detriment, that he would not have taken" if the defendant had not made a misrepresentation, or that plaintiff "failed, to his detriment, to take action that he would have taken" had the defendant been truthful. *Greeley v. Fairview Health Servs.*, 479 F.3d 612, 614 (8th Cir. 2007). SEI's allegations indicate that it knew immediately that SST's representations about the ownership of the work product in question were false. In other words, according to the complaint, SEI knew that it, not SST, was the owner of the software and therefore could not have acted in reliance on SST's representations which SEI knew to be false. Therefore, SEI's fraud claim fails because it has not alleged anything it did, or did not do, in reliance on SST's representations that it was the owner of the work product in question. Consequently, the Court will dismiss SEI's fraud claim against SST.

### E.    Conversion

#### 1.    Count V – Against Monsanto

SEI brings a claim of conversion based upon Monsanto's retaining SEI's work product and intellectual property after the termination of the Agreement. (Compl. ¶ 105.) SEI alleges that "Monsanto . . . has held out to the general public and the agriculture industry that the work product and intellectual property of SEI is its own exclusively and thereby deprived, in whole or in part, SEI from the use, possession and value of its property." (*Id.*) As a consequence, SEI alleges that it has "suffered significant economic

damages, including but not limited to the reduced value of SEI's property as it might be either sold or licensed to others in the agriculture industry or marketed directly to end users by SEI." (*Id.* ¶ 106.) Although not entirely clear from the complaint, SEI indicated at oral argument that the work product at issue in the conversion claim is copies of the IntelliScans distributed to Monsanto customers and copies of SEI's software.

To establish a claim for conversion, a plaintiff must demonstrate that: (1) plaintiff was the owner of the property or entitled to its possession; (2) defendant took possession of the property with the intent to exercise some control over it; and (3) defendant thereby deprived plaintiff of the right to possession." *JEP Enters., Inc. v. Wehrenberg, Inc.*, 42 S.W.3d 773, 776 (Mo. Ct. App. 2001). A party who lawfully takes possession of property but wrongfully refuses to return it to its owner may be subject to liability for conversion. *See Green Valley Seed, Inc. v. Plenge*, 72 S.W.3d 601, 603 (Mo. Ct. App. 2002); *see also Emerick v. Mut. Benefit Life Ins. Co.*, 756 S.W.2d 513, 523 (Mo. 1988). In order to sustain a claim for conversion based on property that was initially lawfully retained, the plaintiff must prove as an element of the claim that a demand for return of the property was made. *Green Valley Seed*, 72 S.W.3d at 603.

To the extent that SEI's conversion claim is based on loss of possession of physical property, the Court finds that the complaint is insufficient to state a claim for conversion. Given a generous reading of the complaint, SEI could be alleging that it was entitled to possession of physical or electronic documents provided to Monsanto during the course of the Agreement because Monsanto did not fulfill its obligations under the contract. Although SEI alleges that Monsanto's termination of the Agreement was

wrongful, it does not indicate how Monsanto's possession of SEI's physical or electronic documents after the termination of the Agreement was wrongful. Nor has SEI alleged that Monsanto refused to return the documents. *See Green Valley Seed*, 72 S.W.3d at 603. Moreover, in its briefing and at oral argument SEI referred exclusively to Monsanto's possession of copies of SEI's work product. Missouri courts have long held that "a copy of a document cannot be converted because the owner has not been deprived of possession." *Monarch Fire Prot. Dist. v. Freedom Consulting & Auditing Servs., Inc.*, 678 F. Supp. 2d 927, 944 (E.D. Mo. 2009). Accepting the facts in the complaint as true, SEI alleges only that Monsanto retained physical or electronic copies of SEI's work product. That SEI has not been deprived of possession is further demonstrated by its request for damages. SEI does not seek damages for loss of possession but instead seeks "the reduced value of SEI's property as it might be either sold or licensed to others." Because SEI also retains its work product it has not been deprived of possession, and cannot maintain a cause of action for conversion.

Finally, to the extent SEI's conversion claim is based more generally upon Monsanto's retention of SEI's intellectual property, it also fails, because "conversion does not lie for the appropriation of an idea." *Schaefer v. Spence*, 813 S.W.2d 92, 96 (Mo. Ct. App. 1991). The law of conversion "is concerned with possession, not title." *Monsanto Co. v. Hill*, No. 4:03-CV-18, 2004 WL 4996339, at *5 (E.D. Mo. May 21, 2004). Therefore conversion of intangible property cannot occur where the plaintiff still has the information that the defendant allegedly appropriated. *Id.* at *4-5. Here, SEI does not dispute that it retains the software it created during the course of the Agreement.

Monsanto's retention of any intellectual property did not, therefore, deprive SEI of possession and cannot be the basis of a conversion claim. Accordingly, the Court will dismiss SEI's conversion claim against Monsanto.

### 2. Count VI – Against SST

SEI's conversion claim against SST is based on the same set of facts underlying the conversion claim against Monsanto. SEI alleges that SST converted SEI's property when it began to use SEI's work product and intellectual property, and held those materials out to the public as SST's own work. (Compl. ¶ 108.)

Under Minnesota law, conversion is "an act of willful interference with personal property, done without lawful justification by which any person entitled thereto is deprived of use or possession." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997) (internal quotation marks omitted).

The Court finds that SEI cannot maintain a conversion claim against SST, because the claim is preempted by SEI's claim under the Minnesota Uniform Trade Secrets Act ("MUTSA"). MUTSA provides that "this [Act] displace[s] conflicting tort, restitutionary, and other law of this State providing civil remedies for misappropriation of a trade secret." Minn. Stat. § 325C.07(a). MUTSA does not, however, affect contractual remedies, other civil remedies not based upon misappropriation of a trade secret, or criminal remedies. *Id.* § 325C.07(b). Under MUTSA's displacement provision, a plaintiff may maintain separate causes of action only "to the extent that the causes of action have 'more' to their factual allegations than the mere misuse or misappropriation

of trade secrets." *Micro Display Sys., Inc. v. Axtel, Inc.*, 699 F. Supp. 202, 205 (D. Minn. 1988).

Here, SEI's conversion claim is based on factual allegations that are identical to its MUTSA claim. Both claims identify SST's use of SEI's work product and intellectual property as the basis of the claims. SEI's conversion claim alleges that SST converted SEI's intellectual property by representing that the materials were created by SST. Similarly, SEI's misappropriation of trade secrets claim alleges that the "intellectual property created by SEI in connection with the performance of the Agreement constituted and constitutes a 'trade secret' as defined" in MUTSA. (Compl. ¶ 128.) Reviewing the MUSTA and the conversion claims in SEI's complaint, there is no information that SEI alleges was converted that it does not also allege is a trade secret, therefore SEI's common law claim for conversion is preempted by MUTSA. *See, e.g.*, *CHS, Inc. v. PetroNet, LLC*, Civ. No. 10-94, 2011 WL 1885465, at *11 (D. Minn. May 18, 2011) (finding with respect to a misuse of confidential information claim that "[b]ecause CHS points to nothing confidential that it does not also claim is a trade secret, it has failed to allege any facts underlying [the confidential information claim] that are independent from its misappropriation claim. Its common-law claim is therefore displaced by the MUTSA and cannot survive"); *Lutheran Ass'n of Missionaries & Pilots, Inc. v. Lutheran Ass'n of Missionaries and Pilots*, Civ. No. 03-6173, 2005 WL 629605, at *13 (D. Minn. Mar. 15, 2005) (finding a conversion claim to be displaced by MUTSA where the conversion claim alleged the misuse or misappropriation of the material sought to be protected under MUTSA). Therefore, the Court will dismiss the conversion claim against SST.

### F.      Minnesota Uniform Deceptive Trade Practices

#### 1.      Count VII – Against Monsanto

SEI alleges that Monsanto violated Minnesota's Uniform Deceptive Trade Practices Act ("MUDTPA"), Minn. Stat. §§ 325D.43 – 325D.48, by representing that the intellectual property of SEI was actually its own property. (Compl. ¶¶ 112-13.) SEI's claim brought under Minn. Stat. § 325D.44 must be dismissed because SEI's Minnesota statutory claims do not survive the designation of Missouri law under the Agreement. *See Nw. Airlines, Inc.*, 111 F.3d at 1392 n.4; *Warren E. Johnson Cos.*, 735 F. Supp. 2d at 1108 n.7. Because the Court has concluded that Missouri law applies to SEI's claims, it will allow SEI to file an amended complaint within twenty-one days alleging a cause of action under Missouri's deceptive trade practices law.

#### 2.      Count VIII – Against SST

SEI also alleges that SST violated MUDTPA by representing that the intellectual property of SEI was actually its own property. (Compl. ¶ 117.) Specifically, SEI alleges that SST passed off SEI's intellectual property as its own, created a likelihood of confusion as to the source of the intellectual property, and disparaged SEI's intellectual property by making false or misleading representations. (*Id.* ¶ 118.)

SST argues that SEI's MUDTPA claim is also displaced by MUTSA. The Court, however, finds that there is "more" to SEI's MUDTPA claim than the mere misuse or misappropriation of trade secrets. *See Micro Display Sys.*, 699 F. Supp. at 205. In its MUDTPA claim, SEI does not allege merely that SST misappropriated SEI's intellectual

property for its own gain.  Rather, the factual allegations – although admittedly similar to the MUTSA claim – identify the actionable conduct as SST holding itself out to the world as the creator of SEI's intellectual property.  Therefore, SEI's MUDTPA claim is not based on misappropriation alone, but includes allegations of SST's representations about SEI's intellectual property to the public.  Therefore, the Court concludes that SEI's MUDTPA claim is not displaced by MUTSA.

Although SEI's MUDTPA claim is not displaced, the Court finds that it fails to plead a permissible basis for relief.  Under Minnesota law, "the sole statutory remedy for deceptive trade practices is injunctive relief."  *Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336, 339 (Minn. Ct. App. 1999) (internal quotation marks omitted); *see* Minn. Stat. § 325D.45, subd. 1 ("A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it . . . .").  MUDTPA "provides relief from future damage, not past damage."  *Gardner v. First Am. Title Ins. Co.*, 296 F. Supp. 2d 1011, 1020 (D. Minn. 2003) (internal quotation marks omitted).  In its complaint, SEI alleges that "[a]s a direct and proximate result of the violations of [MUDTPA] by SST, SEI has suffered economic damages and is entitled to recover such damages from SST."  (Compl. ¶ 119.)  The only relief SEI seeks in conjunction with its MUDTPA claim is unavailable under the statute, and therefore the Court will dismiss its claim.  The Court will, however, allow SEI to file an amended complaint within twenty-one days seeking appropriate remedies under MUDTPA.  The Court also notes that should SEI choose to amend its MUDPTA claim, in addition to pleading a viable claim for injunctive relief, it must comply with the heighted pleadings

standards of Federal Rule of Civil Procedure 9. *See E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 665 (8th Cir. 2012).

### G.  Minnesota Uniform Trade Secrets Act

#### 1.  Count IX – Against Monsanto

As explained above, because Missouri law applies to SEI's claims brought against Monsanto, SEI cannot maintain a cause of action for violation of MUTSA. *See Nw. Airlines, Inc.*, 111 F.3d at 1392 n.4. Because the Court has concluded that Missouri law applies to SEI's claims, it will allow SEI to file an amended complaint within twenty-one days alleging a cause of action under Missouri's trade secrets law.

#### 2.  Count X – Against SST

SEI alleges that "[t]he intellectual property created by SEI in connection with the performance of the Agreement constituted and constitutes a 'trade secret'" within the meaning of Minnesota's statute. (Compl. ¶ 128.) SEI further alleges that SST acquired SEI's trade secrets through improper means and disclosed those secrets without express or implied consent. (*Id.* ¶ 129.)

MUTSA, Minn. Stat. §§ 325C.01-08, prohibits the "misappropriation" of trade secrets. Minn. Stat. § 325C.01, subd. 3; *see Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 897 (Minn. 1983). A trade secret is information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, persons who can obtain economic value from its disclosure or use" and is "the subject of efforts that are reasonable under

the circumstances to maintain its secrecy." Minn. Stat. § 352C.01, subd. 5; *see also*

*Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 958 (D. Minn. 1999). "A defendant is liable for

misappropriation of a trade secret if the defendant has acquired the trade secret through

improper means." *Wyeth v. Natural Biologics, Inc.*, 395 F.3d 897, 900 (8th Cir. 2005).

Improper means include "theft, bribery, misrepresentation, breach or inducement of a

breach of a duty to maintain secrecy, or espionage through electronic or other means."

Minn. Stat. § 325C.01, subd. 2. Misappropriation can also occur if a defendant acquires a

trade secret from another person and "knows or has reason to know that the trade secret

was acquired by improper means." Minn. Stat. § 325C.01, subd. 3(i). Disclosure or use

of a trade secret constitutes a statutory violation when the disclosure or use is without

consent by a person who

> (B) at the time of the disclosure or use, knew or had reason to know that the
> discloser's or user's knowledge of the trade secret was
>
> > (I) derived from or through a person who had utilized improper
> > means to acquire it;
> >
> > (II) acquired under circumstances giving rise to a duty to maintain its
> > secrecy or limit its use; or
> >
> > (III) derived from or through a person who owed a duty to the person
> > seeking relief to maintain its secrecy or limit its use[.]

Minn. Stat. § 325C.01, subd. 3(ii)(B).

Assuming the truth of the facts asserted in the complaint, the Court finds that SEI

has sufficiently alleged a claim under MUTSA. SEI alleges that the intellectual property

it created within the scope of the Agreement is a trade secret. The Agreement is rife with

detail about what software was contemplated in the Development Plan, suggesting that

the intellectual property over which SEI claims trade secret designation is at least reasonably defined. Although the description in SEI's complaint of the trade secrets sought to be protected may lack the precision necessary for the entry of an injunction, *see, e.g.*, *Electro-Craft Corp.*, 332 N.W.2d at 898 (finding a "lack of clarity" in defining trade secrets prevented the entry of an injunction), it is sufficient to satisfy the pleading requirement of a "short plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a). In addition to adequately defining the trade secrets sought to be protected, the complaint contains sufficient allegations that the intellectual property is, in fact, a trade secret. Although the complaint does not precisely describe all of the reasons SEI's software is a trade secret, "[t]he exact nature of the trade secret is a matter for discovery." *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 292 F. Supp. 2d 1173, 1179 (D. Minn. 2003). The lengthy complaint contains sufficient details – such as the referenced exclusivity and confidentiality portions of the Agreement – that allow the Court to draw the reasonable inference that the intellectual property SEI created is more valuable if it is not known or readily ascertainable and that SEI has undertaken efforts to keep the information confidential. *See id.* at 1178-79 (denying a motion to dismiss a MUTSA claim where the complaint alleged that the design in question was not generally known or readily ascertainable, and "implie[d]" that the design "derived independent economic value from not being generally known").

Similarly, the Court finds that the complaint contains sufficient allegations of misappropriation. The complaint alleges that Monsanto wrongfully terminated the Agreement and retained SEI's trade secret software developments. The Agreement

contained a confidentiality clause, prohibiting the parties from publishing or disclosing certain confidential information. (Compl., Ex. B at 31.) Accepting the facts in the complaint as true, Monsanto's acquisition, use or disclosure of SEI's software could constitute a breach of a duty to maintain secrecy under the Agreement and therefore be improper means within the meaning of MUTSA. *See Electro-Craft Corp.*, 332 N.W.2d at 903 (finding that breach of a duty not to disclose could constitute misappropriation under MUTSA). The complaint also alleges that Monsanto provided this software to SST, who was aware of the working relationship between Monsanto and SEI, and therefore knew or should have known that Monsanto's continued use of SEI's software was improper. The complaint also alleges that SST acquired, disclosed, and used these software developments. These allegations are therefore sufficient to state a claim for misappropriation of trade secrets under MUTSA. Accordingly, the Court will deny SST's motion to dismiss.

### H.    Tortious Interference

Minnesota law recognizes two separate torts relating to interference with economic relations: (1) interference with an existing contract; and (2) interference with a prospective business relation. *See Hern v. Bankers Life Cas. Co.*, 133 F. Supp. 2d 1130, 1137 (D. Minn. 2001). It is not entirely clear which claim SEI intends to make against either Monsanto or SST, but the Court finds that either claim would fail.

To establish a cause of action for tortious interference with an existing contract, the plaintiff must prove "(1) the existence of a contract; (2) the alleged wrongdoer's

knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998) (internal quotation marks omitted). SEI argues that the third element – intentional procurement of a breach – does not require the defendant to actually procure a breach. The law is clear in Minnesota, however, that a claim for tortious interference with contractual relations "fails as a matter of law" if it does not allege that the defendant "intentionally procured a breach" of the contract. *E-Shops Corp. v. U.S. Bank, Nat'l Ass'n*, 678 F.3d 659, 665 (8th Cir. 2012); *see Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982).

In order to state a claim for tortious interference with prospective business relations, a plaintiff must prove: (1) the existence of a reasonable expectation of economic advantage or benefit belonging to plaintiff; (2) that defendants had knowledge of that expectation; (3) that defendants wrongfully and without justification interfered with plaintiff's reasonable expectation; (4) that in the absence of the defendant's wrongful act, it is reasonably probable that plaintiff would have realized the economic advantage or benefit; and (5) plaintiff sustained damages. *Cenveo Corp. v. S. Graphic Sys., Inc.*, 784 F. Supp. 2d 1130, 1137-38 (D. Minn. 2011); *Harbor Broad., Inc. v. Boundary Waters Broads., Inc.*, 636 N.W.2d 560, 569 (Minn. Ct. App. 2001).

### 1.    Count XI – Against Monsanto

SEI's tortious interference claim against Monsanto is based upon Monsanto entering into a license agreement with the Spangenberg Group after terminating the

Agreement. (Compl. ¶ 135.) SEI alleges the license agreement between Monsanto and the Spangenberg Group "had the effect of damaging, devaluing and interfering with the business relationship and contract that existed between SEI and the Spangenberg Group." (*Id.*)

Here, SEI does not allege that the Spangenberg Group breached its contract with SEI after Monsanto entered into a separate licensing agreement with the Group. Indeed, SEI's contract with the Spangenberg Group specifically indicated that the licenses granted to SEI were non-exclusive. Therefore, the Court cannot infer from the allegations in the complaint that the Spangenberg Group breached its license agreement with SEI by entering into a license agreement with Monsanto. Instead, the allegations indicate only that Monsanto entered into a separate agreement with the Spangenberg Group. Consequently, the Court concludes that SEI's claim for tortious interference with a contract against Monsanto fails. *See Sip-Top, Inc. v. Ekco Grp., Inc.*, 86 F.3d 827, 832 (8ᵗʰ Cir. 1996) (finding summary judgment appropriate on tortious interference with an existing contract claim where "evidence does not support an inference that [defendant's] actions cause [plaintiff] to lose a contract"); *R.A., Inc. v. Anheuser-Busch, Inc.*, 556 N.W.2d 567, 570 (Minn. Ct. App. 1996) (finding summary judgment appropriate on tortious interference with an existing contract claim where plaintiffs "could not establish the breach of a contract").

Notably, even if the procurement of a breach was not required, SEI's complaint fails to demonstrate how its performance under its license agreement with the Spangenberg Group has become more difficult or less profitable. SEI's only argument is

the licenses it obtained under its agreement with the Spangenberg Group are no longer valuable because the licenses were intended to be used to perform under the Agreement that Monsanto terminated. That Monsanto terminated its own contract, however, cannot be the basis for a tortious interference claim. Therefore, to the extent SEI's tortious interference claim against Monsanto alleges tortious interference with an existing contract, the Court will dismiss that claim.

The Court similarly finds that any claim for interference with a prospective business relationship fails because SEI's complaint does not allege how Monsanto's actions harmed SEI's relationship with Spangenberg. Damages for interference with a prospective business relation may not be "remote, conjectural, or speculative." *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1506 (8th Cir. 1992) (internal quotation marks omitted). SEI has identified no prospective business relationship with the Spangenberg Group that it was unable to pursue or lost out on because Monsanto entered into a separate agreement with the Group. Furthermore, SEI has not alleged that Monsanto's actions were improper or unjustified. "Generally, a defendant's actions are justified if it pursues its legal rights via legal means." *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir. 2008) (citing *Langeland v. Famers State Bank of Trimont*, 319 N.W.2d 26, 32-33 (Minn. 1982)). Although justification is typically a question of fact for a defendant to prove, if the defendant's affirmative defense is apparent on the face of the complaint that "can provide the basis for dismissal under Rule 12(b)(6)." *Id.* at 982-83. Here, Monsanto's justification – that it was legal to enter into a nonexclusive license agreement with the Spangenberg Group – is apparent from the face of the complaint.

Accordingly, to the extent that SEI's tortious interference claim alleges tortious interference with prospective business relations, the Court will dismiss that claim as well.

### 2. Count XII – Against SST

SEI's tortious interference claim against SST alleges that SST's conduct constituted "an unjustified, intentional interference with the contracts and business relationship between SEI and Monsanto." (Compl. ¶ 137.) Specifically, the complaint alleges that SST "substantially contributed to the breach, by Monsanto, of its agreement with SEI." (*Id.*) The complaint also alleges that SST "intentionally interfered with the contract and business relationship between SEI and the Spangenberg Group." (*Id.*)

For the reasons explained above, the tortious interference claim with respect to the Spangenberg Group fails as to SST. The Spangenberg Group did not breach its contract with SEI. Additionally, the complaint does not allege that SST had any contacts or dealings with the Spangenberg Group that could have interfered with the existing or prospective business relationship between the Spangenberg Group and SEI.

The Court also finds that SEI's tortious interference claims against SST related to Monsanto and the Agreement fail. With respect to tortious interference with an existing contract, the complaint contains no allegations from which the Court could infer that SST intentionally procured Monsanto's breach of the Agreement. The complaint merely provides labels and conclusions that SST "substantially contributed to the breach," that are insufficient to withstand a motion to dismiss. *See Iqbal*, 556 U.S. at 678. Furthermore, the complaint contains no allegations that any contribution SST may have

made to Monsanto's breach of the Agreement was without justification. Rather, the complaint explains in detail how Monsanto's, not SST's, wrongful conduct resulted in termination of the Agreement. SEI has not alleged any wrongful or illegal action SST took to procure a breach. *See Matson Logistics, LLC v. Smiens*, Civ. No. 12-400, 2012 WL 2005607, at \*11 (D. Minn. June 5, 2012) (granting a motion to dismiss where the complaint alleged "no improper means" and stated only that defendants intentionally and improperly procured a breach). In the absence of any wrongful action, interference with an existing contract is not actionable if it is done "with the honest purpose of fairly bettering one's own business, trade, or employment, and not for the primary object of destroying another's employment or business." *Bennett*, 134 N.W.2d at 897. SST was involved in its own software contract with Monsanto, therefore, in the absence of allegations of wrongful conduct any alleged interference is not actionable, and the Court will dismiss the claim.

Finally, SEI has failed to state a claim for interference with a prospective business relationship. Other than the Agreement, which is subject to the above analysis, SEI's complaint fails to identify any reasonable expectation of a prospective business relation with Monsanto with which SST interfered. Mere allegations that SST interfered with the business relationship between Monsanto and SEI are too general and speculative to survive a motion to dismiss. *See Amerinet, Inc.*, 972 F.3d at 1506. Because SEI has identified no business relationship with Monsanto, other than the Agreement, that it was unable to pursue or lost out on due to SST's conduct, the Court will dismiss the tortious interference claim.

## II.    MOTION FOR PRELIMINARY INJUNCTION

SEI also brings a motion for a preliminary injunction, asking the Court to enjoin Monsanto from enforcing the arbitration clause which is contained in the Agreement. SEI argues that the arbitration clause applies to the breach of contract claim stated in Count I.  Although Monsanto has not attempted to enforce the arbitration provision, and indeed affirmatively declares that it will not do so, SEI asks that the Court enjoin Monsanto from enforcing the arbitration clause until federal litigation has been completed.  In response, Monsanto contends that SEI waived its right to arbitrate Count I.

### A.    Preliminary Injunction

Injunctive relief is an "extraordinary remedy."  *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008).  The basis for injunctive relief in federal courts is "irreparable injury and the inadequacy of legal remedies."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  Here, SEI as the moving party bears the burden of persuasion.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation marks omitted).

The Court considers four factors in determining whether to grant preliminary injunctive relief: (1) the probability that the moving party will succeed on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance of harms as between the parties; and (4) the public interest.  *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012) (citing *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).

The only factor SEI addresses is the likelihood of irreparable harm. Irreparable harm is harm that is "certain and great and of such imminence that there is a clear and present need for equitable relief." *S.J.W. ex rel. Wilson*, 696 F.3d at 778 (internal quotation marks omitted)). A mere possibility of irreparable harm is not enough for a preliminary injunction to issue. *Winter*, 555 U.S. at 22; *S.J.W. ex rel. Wilson*, 696 F.3d at 779.

SEI argues that it will suffer harm if Monsanto compels arbitration before the conclusion of the present litigation. This is so, SEI claims, because its arbitrable breach of contract claim and nonarbitrable tort claims involve "common, interwoven and inseparable issues of fact." (Mot. for Prelim. Inj. at 2, Nov. 29, 2012, Docket No. 8.) SEI argues that allowing arbitration on Count I to proceed before the end of these federal proceedings will deprive SEI of its right to a jury trial on its tort claims because adjudication of these intertwined factual issues by an arbitrator will, through collateral estoppel and res judicata, bind this Court's later resolution of those claims.

The Court finds that the possibility of Monsanto compelling arbitration before the conclusion of the federal proceedings is insufficient to warrant entry of a preliminary injunction. Monsanto wrote SEI a letter explicitly confirming that "Monsanto does not intend to initiate an arbitration proceeding," and "will not initiate any such proceeding." (First Aff. of Jennifer S. Kingston, Ex. B, Dec. 20, 2012, Docket No. 21.) Monsanto has filed this document with the Court and has confirmed in its briefs and at oral argument that it does not and will not seek to enforce the arbitration clause. Because of Monsanto's clear and unequivocal promise not to seek arbitration, the only harm SEI

alleges is unlikely and speculative, and therefore fails to meet the standard of irreparable harm required for the entry of an injunction. *See Winter*, 555 U.S. at 22; *see also Dataphase Sys.*, 640 F.3d at 114 n.9 ("[T]he absence of a finding of irreparable injury is alone sufficient ground for vacating [a] preliminary injunction.").[8] Because Monsanto presents no present risk of attempting to enforce the arbitration clause, and SEI can therefore demonstrate no irreparable harm, the Court will deny SEI's motion for a preliminary injunction.

As a final matter, at oral argument SEI appeared to argue that its motion for a preliminary injunction was actually one for a stay under the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* SEI explained that its motion seeks to prevent Monsanto from compelling arbitration during the pendency of these proceedings. SEI further explained that its motion requests that the Court stay federal litigation of Count I and resolve SEI's other eleven claims. At some point in the future, once those eleven claims have been resolved, SEI claims that it will move to compel arbitration of Count I. SEI argued that the Court has no discretion in deciding whether to stay Count I, citing 9 U.S.C. § 3 and the Supreme Court's decision in *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985). Neither of these authorities provides support for SEI's requested relief.

The Federal Arbitration Act provides that the Court "shall on application of one of the parties stay the trial of the action until . . . arbitration has been had in accordance with

---

[8] Even if Monsanto were to compel arbitration before the conclusion of these proceedings, SEI's fear that the arbitration would have a preclusive effect upon a jury's determination of the nonarbitrable claims is also speculative at best. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 222 (1985) (explaining that it is "far from certain that arbitration proceedings will have any preclusive effect on the litigation of nonarbitrable federal claims").

the terms of the agreement." 9 U.S.C. § 3. This provision does not support SEI's course of action, because SEI is not seeking a stay of these proceedings until arbitration has concluded. Instead, SEI is requesting that this court stay federal litigation involving the arbitrable claim, resolve some of the claims in SEI's complaint, and then allow SEI to compel arbitration on Count I. Such a scenario is not contemplated by the statute, and the Court therefore finds that it is not bound to issue a stay pursuant to 9 U.S.C. § 3. *See All Saint's Brands, Inc. v. Brewery Grp. Denmark, A/S*, 57 F. Supp. 2d 825, 832 (D. Minn. 1999) ("The Court avoids becoming enmeshed in additional procedural hurdles by declining a stay where a party states a desire to have arbitration, but does not commence the arbitration proceeding after lengthy delays."). Furthermore, *Dean Witter Reynolds* is inapposite. In *Dean Witter Reynolds*, the Supreme Court held that "the Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." 470 U.S. at 217. As explained above, neither party has filed a motion to compel arbitration, and neither party has filed a motion to stay these federal proceedings during the pendency of arbitration. Therefore, *Dean Witter Reynolds* does not require the course of action SEI proposes.

### B. Waiver of the Right to Arbitrate

Monsanto urges the Court to determine that SEI has waived its right to arbitration, and both parties have fully briefed the issue of waiver. Delaying determination of whether SEI has waived its right to arbitration will result in inefficient and piecemeal

litigation.  If SEI has waived its right to arbitrate Count I, a determination of that waiver at this stage of litigation will allow discovery and dispositive motions to proceed simultaneously on Count I and SEI's remaining claims.  Therefore, the Court will consider the issue of waiver.

Although federal policy favors arbitration as a form of dispute resolution, a party may waive its contractual right to arbitrate.  *Erdman Co. v. Phoenix Land & Acquisition, LLC*, 650 F.3d 1115, 1117 (8th Cir. 2011).  A party waives its right to arbitrate when: (1) the party knew of an existing right to arbitration; (2) the party acted inconsistently with that right; and (3) the party caused prejudice to the opposing party through its conduct.  *Id.*  Each factor must be met for the Court to determine that SEI has waived its right to arbitrate.  *See Dumont v. Saskatchewan Gov't Ins.*, 258 F.3d 880, 887 (8th Cir. 2001).  Doubts concerning waiver should be resolved in favor of allowing arbitration.  *Id.* at 886.

### 1.    Knowledge of Right to Arbitrate

In Count I of its complaint, SEI "concedes that Count I should be resolved by arbitration, but . . . seeks to stay such arbitration pending the conclusion of this action as to the remaining claims and counts set forth hereinafter."  (Compl. ¶ 85.)  It is clear from SEI's complaint that SEI knows, and knew of, its right to arbitrate when it filed the instant lawsuit.

## 2.      Actions Inconsistent with the Right to Arbitrate

"A party acts inconsistently with its right to arbitrate if the party substantially invokes the litigation machinery before asserting its arbitration right." *Hooper v. Advance Am., Cash Advance Ctrs. of Mo., Inc.*, 589 F.3d 917, 921 (8th Cir. 2009) (internal quotation marks omitted). To preserve its rights to arbitrate, a party must "do all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration." *Lewallen v. Green Tree Servicing, L.L.C.*, 487 F.3d 1085, 1091 (8th Cir. 2007) (internal quotation marks omitted). If a party "seek[s] a decision on the merits before attempting to arbitrate," it has acted inconsistently with its right to arbitrate. *See Hooper*, 589 F.3d at 921 (internal quotation marks omitted). Similarly, parties can substantially invoke the litigation machinery by filing a lawsuit on arbitrable claims, engaging in extensive discovery, or failing to timely move to compel arbitration and stay litigation. *See Lewallen*, 487 F.3d at 1092-93; *see also Kelly v. Golden*, 352 F.3d 344, 349-50 (8th Cir. 2003); *Stifel, Nicolaus & Co. v. Freeman*, 924 F.2d 157, 158 (8th Cir. 1991).

Here, SEI attempts to use the judicial process first, while keeping the arbitration process open for its later use. By purporting to reserve Count I for arbitration SEI is not requesting that the Court resolve the entire dispute between the parties. However, SEI admits that it **is** seeking resolution of many of the facts underlying Count I, as the facts supporting all of SEI's claims are closely related to resolution of the breach of contract claim. Furthermore, SEI "demands judgment against Monsanto for damages, costs, prejudgment interest, and for such other and further relief as the Court deems just" for

Count I, directly after SEI purports to reserve its right to arbitrate. (Compl. ¶ 85.) This suggests that SEI seeks judicial relief as an alternative to any relief it may obtain in arbitration of its breach of contract claim.

SEI argues that by reserving its right to arbitrate Count I in the complaint, its actions have not been inconsistent with its right to arbitrate. If SEI had filed its complaint and then sought to compel arbitration its argument about its reservation of rights may be persuasive. *See Dumont*, 258 F.3d at 887 (finding that defendant had not waived its right to arbitrate when it filed a motion to dismiss without seeking to litigate the merits of any of the claims and specifically indicated its intent to compel arbitration in the near future). But that is not what SEI has done. SEI has filed a complaint, asked this forum to resolve significant factual issues related to the arbitration, and provided notice that it may, at some point in the future, seek arbitration of Count I. In arguing for a preliminary injunction, SEI admits that its arbitrable and nonarbitrable claims are substantially intertwined, and that it asks that significant factual and legal issues that bear upon resolution of Count I be determined by this forum. By invoking the judicial process to decide key issues that underlie its arbitrable claims, SEI has acted inconsistently with its right to arbitrate. *See, e.g. PPG Indus., Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 109 (2d Cir. 1997) (finding that party waived its right to arbitrate where, among other factors, adjudication of the substantive issues in the litigation would be binding on the arbitration proceedings); *JP Morgan Chase Bank v. Republic Mortg. Ins. Co.*, Civ. No. 10-6141, 2012 WL 6005384, at *3 (D.N.J. Nov. 30, 2012) (explaining that a party waives its right to arbitrate claims that are not distinct from litigated claims); *see also Kelly*, 353

F.3d at 349-50 (finding that failure to compel arbitration for more than a year supported a finding of waiver).

### 3.    Prejudice

Having found that the first two elements of waiver are satisfied, the Court must determine whether SEI's inconsistent acts have prejudiced Monsanto. *See Kelly*, 352 F.3d at 349. Prejudice manifests in many ways, including when the parties litigate substantial issues on the merits, when the parties use discovery not available in arbitration, or "when compelling arbitration would require a duplication of efforts." *Id.*; *see also Hooper*, 589 F.3d at 923.

Here, the litigation has not yet been extensive. However, leaving open the possibility of arbitration after the conclusion of this litigation would require substantial duplication of effort. As explained above, resolving the undismissed counts will require the Court to interpret many aspects of the original Agreement. For example, to determine whether Monsanto wrongfully misappropriated SEI's software for purposes of SEI's MUTSA claim, this forum will be required to determine whether Monsanto's termination of the Agreement was wrongful and the ownership rights to the software as defined by the Agreement. To require the parties to then relitigate those issues in arbitration would amount to prejudice. Furthermore, Monsanto would be prejudiced in arbitration proceedings if SEI used discovery obtained in these proceedings related to Count I that would otherwise have been unavailable in arbitration. Monsanto also suffers a unique prejudice related to discovery in this litigation based upon SEI's attempt to delay

arbitration. At oral argument, SEI indicated that any discovery as to the Agreement in this litigation would be inappropriate. Because interpretation of the Agreement is integral to SEI's remaining claims, such a prohibition would plainly prejudice Monsanto and hamper the ability of the Court to effectively resolve the remaining claims. Furthermore, although litigation has not progressed substantially, the parties have already invested significant resources in arguing the substantive interpretation of the Agreement to dismiss other, related claims. Therefore, the Court finds that SEI's attempt to litigate Counts II-XII first and arbitrate Count I later will prejudice Monsanto. Consequently, the Court finds that SEI has waived its right to arbitrate Count I, and will resolve that claim as part of this litigation.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion for Preliminary Injunction [Docket No. 8] is **DENIED**.

2.      Defendant Monsanto's Motion to Dismiss [Docket No. 22] is **GRANTED** as follows:

a.      Plaintiff's breach of contract claim (Count II) is **DISMISSED without prejudice**. Within twenty-one (21) days Plaintiff may file an amended complaint incorporating the allegations of Count II into Count I.

b.      Plaintiff's Minnesota Uniform Deceptive Trade Practices Act claim (Count VII), and Minnesota Uniform Trade Secrets Act claim (Count IX) are

**DISMISSED without prejudice**.  Within twenty-one (21) days Plaintiff may file an amended complaint with respect to these claims.

        c.      Plaintiff's fraud claim (Count III), conversion claim (Count V), and tortious interference claim (Count XI) are **DISMISSED with prejudice**.

        3.      Defendant SST's Motion to Dismiss [Docket No. 27] is **GRANTED in part** and **DENIED in part** as follows:

        a.      Defendant SST's motion to dismiss is **GRANTED** with respect to Plaintiff's fraud claim (Count IV), conversion claim (Count VI), and tortious interference claim (Count XII).  These claims are **DISMISSED with prejudice**.

        b.      Defendant SST's motion to dismiss is **GRANTED** with respect to Plaintiff's Minnesota Uniform Deceptive Trade Practices Act claim (Count VIII). This claim is **DISMISSED without prejudice**.  Within twenty-one (21) days Plaintiff may file an amended complaint with respect to this claim.

        c.      Defendant SST's motion to dismiss is **DENIED** with respect to Plaintiff's Minnesota Uniform Trade Secrets Act claim (Count X).


DATED:  August 9, 2013             s/ John R. Tunheim
at Minneapolis, Minnesota.           JOHN R. TUNHEIM
                                  United States District Judge