# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| SUPERIOR EDGE, INC., | Civil No. 12-2672 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS** |
| MONSANTO COMPANY and SITE-SPECIFIC TECHNOLOGY DEVELOPMENT GROUP, INC., | |
| Defendants. | |

Walter Joseph Gates, III, **WALTER J. GATES**, 510 Long Street, Suite 109, Mankato, MN  56001; and William G. Osborne, **WILLIAM G. OSBORNE, P.A.**, 1305 East Robinson Street, Orlando, FL  32801, for plaintiff.

James F. Bennett, Jennifer S. Kingston, and Robert F. Epperson, Jr., **DOWD BENNETT LLP**, 7733 Forsyth Boulevard, Suite 1900, St. Louis, MO  63105; and Dean B. Thomson, Lucas Clayton, and Richard G. Jensen, **FABYANSKE WESTRA HART & THOMSON, P.A.**, 333 South Seventh Street, Suite 2600, Minneapolis, MN  55402, for defendants.

This case arises out of a software development and license agreement between Plaintiff Superior Edge, Inc. ("SEI") and Defendant Monsanto Company ("Monsanto"). Pursuant to the agreement, SEI was to develop software for Monsanto to assist in Monsanto's seed sales initiatives.  Monsanto brings counterclaims for breach of contract, money had and received, fraudulent and negligent inducement, conversion, and professional negligence, based primarily on its allegation that SEI represented that it had the infrastructure and capacity to develop software satisfying Monsanto's objectives but

failed to develop and deliver that promised software under the agreement.  SEI moves to dismiss all but the breach of contract counterclaim alleged in Count I.  Because the Court finds that Monsanto has stated plausible claims for relief with respect to its counterclaims for breach of contract, money had and received, fraudulent and negligent inducement, and conversion, the Court will deny SEI's motion as to those counterclaims.  The Court will, however, grant SEI's motion as to the claim for professional negligence, because neither Minnesota nor Missouri courts recognize such a cause of action against computer professionals.

## BACKGROUND[1]

## I.      THE RELATIONSHIP BETWEEN THE PARTIES

Monsanto is a global company that produces and sells commercial seeds and other agricultural products.   (Answer to Am.  Compl. &  Countercls.  ("Countercls."), ¶ 1 Jan. 10, 2014, Docket No. 108.)[2]  SEI describes itself as a software and data company

---

[1]  The Court includes background information only to the extent necessary to rule on the present motion, and recites the facts accepting the allegations in Monsanto's counterclaims as true.   *See Magee v. Trs. of Hamline Univ., Minn.*, 747 F.3d 532, 534-35 (8th Cir. 2014) (explaining that on a motion to dismiss the court "assumes as true all factual allegations in the pleadings, interpreting them most favorably to the nonmoving party").   A recitation of the facts surrounding SEI's allegations and claims can be found in the Court's previous orders.   *See Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017 (D. Minn. 2013); *see also Superior Edge, Inc. v. Monsanto Co.*, Civ. No. 12-2672, 2013 WL 6405362 (D. Minn. Dec. 6, 2013).

[2]  Monsanto originally filed its counterclaims on September 26, 2013.  (Answer to Am. Compl. & Countercls., Sept. 26, 2013, Docket No. 75.)   SEI brought the present motion to dismiss on October 28, 2013.   (Mot. to Dismiss, Oct. 28, 2013, Docket No. 86.)   On December 13, 2013, pursuant to the Court's order dismissing without prejudice one of the claims in SEI's amended complaint brought against Defendant Site Specific Technology Group, Inc., SEI filed a second amended complaint to correct the deficiencies identified by the Court with

(Footnote continued on next page.)

that specializes in creating customized technology-based solutions for businesses.  (*Id.* ¶ 2.)  In 2008, Monsanto began a software development effort aimed at "enhanc[ing] execution of sales by helping farmers make more educated decisions about their purchases of seed products."  (*Id.* ¶ 8.)  Monsanto hoped to obtain a software product that would (1) enable its personnel and dealers in the field to generate a field guide about the general conditions and history of a growing location and recommend a specific seed prescription for that location; and (2) obtain, organize, and present information about the

_____
(Footnote continued.)

respect to that claim.  (Mem. Op. & Order at 11, Dec. 6, 2013, Docket No. 99; Second Am. Compl., Dec. 13, 2013, Docket No. 102.)  Monsanto filed an answer to the Second Amended Complaint which included an identical version of its counterclaims that it had previously filed on September 26, 2013. (Answer to Am. Compl. & Countercl., Jan. 10, 2014, Docket No. 108.)  An amended or later-filed pleading supersedes an original pleading, and renders the original pleading "without legal effect."  *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000). Therefore the counterclaims filed at Docket Number 108 superseded the originally filed counterclaims, and are the operative counterclaims in this case.  *See Cent. Ill. Pub. Serv. Co. v. Indus. Oil Tank & Line Cleaning Serv.*, 730 F. Supp. 1498, 1502 (W.D. Mo. 1990) ("The amended complaint supersedes the original complaint and, thus, [the original complaint] no longer is part of this action.  Accordingly, the new answer and counterclaims supersede the original answer and counterclaims." (citations omitted)).  Although SEI's present motion to dismiss was brought with respect to the original counterclaims, and SEI never formally filed a motion to dismiss the later-filed counterclaims, the Court concludes that it is appropriate to construe SEI's pending motion to dismiss as relating to the operative counterclaims filed at Docket Number 108.  The two sets of counterclaims are identical and the grounds for dismissal raised in SEI's motion therefore apply equally to the later-filed counterclaims.  Additionally, Monsanto has made no argument to the effect that SEI's motion is now moot.  Accordingly, the Court will consider SEI's motion to dismiss as a motion to dismiss the counterclaims filed on January 10, 2014, in response to the second amended complaint.  *See Cartier v. Wells Fargo Bank, N.A.*, 547 F. App'x 800, 804 (8th Cir. 2013) ("In this case, the parties and the district court considered the amended complaint and treated the already pending motion to dismiss as a motion to dismiss the amended complaint.  Appellants raised no objection in the district court to this procedure . . . .  Under these circumstances, we conclude the district court acted within its discretion to treat the motion to dismiss the original complaint as a motion to dismiss the amended complaint.").

unique attributes of individual farms and farmers to allow Monsanto sales representatives to make customized recommendations for products.  (*Id.* ¶ 9.)

In late 2008, Monsanto met the founder and chief executive officer of SEI who represented that SEI had the engineers and infrastructure to deliver complex, innovative technology, and had considerable experience in the agricultural industry.  (*Id.* ¶ 13.)  In a series of meetings that took place throughout 2009, SEI represented that it had the infrastructure and capability to develop software that would meet Monsanto's objectives.  (*Id.* ¶¶ 15-18.)  In particular, SEI represented that it had a software system for creating personalized sales proposals known as SalesEdge that could be adapted to fit Monsanto's needs.  (*Id.* ¶ 15.)

## II.    THE AGREEMENT

On August 7, 2009, Monsanto and SEI executed a Software Development and License Agreement ("the Agreement") with an effective date of March 1, 2009.  (*Id.* ¶ 19.)  The Agreement required SEI to "tailor and/or customize SEI's SalesEdge . . . software, develop new capabilities, and provide services for the purpose of enhancing Monsanto's sales execution."  (Compl., Ex. B at 11, Oct. 19, 2012, Docket No. 1.)[3]  The

---

[3] Page number references are to the CMECF pagination unless otherwise noted.  The Court refers here to the Agreement that was filed as an exhibit to SEI's complaint, even though the Agreement was not attached to Monsanto's counterclaims.  Generally a motion to dismiss under Rule 12(b)(6) must be treated as a motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court."  Fed. R. Civ. P. 12(d).  Although "matters outside the pleading may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004) (internal

(Footnote continued on next page.)

Agreement contained a Development Plan which included "initial requirements, specifications, features, and functionalities" of the software SEI was to develop as well as "a general overview and timetable for development and implementation of the SEI schedule for deliverables, test protocols and procedures, development objectives, and assumptions regarding ongoing contributions and research activities." (*Id.*, Ex. B at 19.) The Development Plan set forth in detail the deliverables – the proposed features and functionality of the software – that SEI was responsible for developing. (*Id.*, Ex. B at 42-49.) The Agreement provided that Monsanto would pay SEI exclusivity payments, development fees, and user fees. (*Id.*, Ex. B at 23-24.) The Agreement also contained various provisions governing the intellectual property rights of the parties with respect to the software developments. (*Id.*, Ex. B at 11, 15, 21-22, 25.)

## III.   SEI'S DEVELOPMENT ACTIVITIES

In the initial phases of the Agreement's implementation Monsanto and SEI met frequently to discuss the software development. (Countercls. ¶ 36.) In early 2010 Monsanto and SEI continued to discuss ideas for the production of customized sales proposals for customers in the field. (*Id.* ¶ 37.) Because SEI's software did not yet have

_____

(Footnote continued.)

quotation marks omitted). Monsanto's counterclaims cite to the Agreement extensively and bring claims for its breach, indicating that the document is necessarily embraced by Monsanto's counterclaims. Furthermore, Monsanto indicated that, but for its belief that the Agreement contained confidential information and could not be filed in the absence of a protective order allowing Monsanto to file the Agreement under seal, it would have attached the Agreement to its counterclaims. (Countercls. ¶ 20 n.1.) Accordingly, the Court considers the contents of the Agreement in ruling on the present motion to dismiss.

this capability, SEI was manually producing the proposals.  (*Id.* ¶ 38)  Although this was not a commercially viable approach for Monsanto long-term, it used the manually produced proposals for a period of time during which SEI was to be developing the software that would allow their production to be automated.  (*Id.*)  In January 2011 Monsanto informed SEI that it would require software with specific features to be completed by May 2011 in order to ensure that automated production of the sales proposals could be demonstrated to Monsanto personnel at its June and July 2011 national sales meetings.  (*Id.* ¶¶ 41-42.)

During early 2011 Monsanto became increasingly concerned with SEI's ability to timely deliver the promised software developments.  (*Id.* ¶ 43.)  SEI would not allow Monsanto to review its source code which "heightened" Monsanto's concerns about the status of the software.  (*Id.* ¶ 45.)  In light of these concerns, Monsanto implemented a backup plan and engaged Defendant Site-Specific Technology Development Group, Inc. ("SST") – another software development company with whom Monsanto had previously contracted – to also develop software with the desired functionality.  (*Id.* ¶¶ 12, 46.)  In the spring of 2011 Monsanto "repeatedly tested SEI's software application [and] encountered a host of different difficulties and error messages."  (*Id.* ¶¶ 48-49.)  In light of these issues, Monsanto could not present the software at its national sales meetings. (*Id.* ¶¶ 50-52.)

## IV.    TERMINATION OF THE AGREEMENT

On August 16, 2011 Monsanto met with SEI to discuss "its disappointment with the numerous development and milestone failures." (*Id.* ¶ 56.)  At the meeting, SEI was still unable to present or deliver the software development code it had promised under the Agreement. (*Id.*)  Monsanto repeated its concerns in writing on August 29, 2011. (*Id.* ¶ 58.)  SEI responded claiming that Monsanto had breached the Agreement in various ways. (*Id.* ¶ 59.)  Shortly thereafter, Monsanto provided formal notice of SEI's breach and notice that it was terminating SEI's development services effective 120 days from September 26, 2011 – the date of the notice. (*Id.* ¶ 60.)  Between August 2009 and January 2012 Monsanto paid SEI a total of $6,716,665 "which it purportedly owed to SEI pursuant to the terms of the Agreement." (*Id.* ¶ 83.)

Based on these allegations, Monsanto brings counterclaims against SEI for breach of the Agreement, money had and received, fraudulent and negligent inducement, conversion, and professional negligence.

## ANALYSIS

## I.    STANDARD OF REVIEW

In reviewing a motion to dismiss brought under Rule 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states "'a claim to relief that is plausible on its face.'" *See Magee v. Trs. of Hamline Univ., Minn.*, 747 F.3d 532, 535 (8th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility" and therefore must be dismissed.  *Id.* (internal quotation marks omitted).  Although the Court accepts the complaint's factual allegations as true, it is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Therefore, to survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## II.    INCORPORATION BY REFERENCE

SEI first argues that Counts II through VII of Monsanto's counterclaims should be dismissed without prejudice for failure to comply with Federal Rule of Civil Procedure 10, which requires parties to state claims or defenses "in numbered paragraphs, each limited as far as practicable to a single set of circumstances" and state "each claim founded on a separate transaction or occurrence . . . in a separate count" where "doing so would promote clarity."  Fed. R. Civ. P. 10.  SEI argues that Monsanto has violated this rule by unnecessarily incorporating in succeeding counts, the allegations of all prior counts.  For example, Count VI alleges a claim for conversion, but incorporates by reference all previous paragraphs in the counterclaims – including the background facts, two claims for breach of contract, a claim for money had and received, a claim for

fraudulent inducement, and one for negligent inducement.   (Countercls. ¶ 153 ("Monsanto repeats, adopts and incorporates herein by reference the allegations made in paragraphs 1 through 152 of these Counterclaims.").)  SEI contends that although "it is possible, with sufficient effort, to sort out which is which, that burden should not be placed on SEI."  (Pl.'s Mem. in Supp. of Mot. to Dismiss at 3, Oct. 28, 2013, Docket No. 87.)

    In resolving Monsanto's arguments based on Rule 10(b), the Court begins with the Federal Rules' pleading standards, which provide that a claim for relief need include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  The purpose of the pleading requirements is simply to "give the [counterclaim] defendant fair notice of what the [counterclaim] plaintiff's claim is and the grounds upon which it rests."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (internal quotation marks omitted).  "No technical form" is required for pleadings, and the Court construes pleadings "so as to do justice."  Fed. R. Civ. P. 8(d)(1), (e).  The Federal Rules also explicitly allow a party to incorporate earlier allegations in a pleading by reference.  *See* Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion.").  Rule 10(c) "was adopted to encourage pleadings that are short and free of unneeded repetition," *Kramer & Frank, P.C. v. Wibbenmeyer*, Civ. No. 05-2395, 2006 WL 3079097, at *2 (E.D. Mo. Oct. 27, 2006) (internal quotation marks omitted); *see also* Wright & Miller, 5A *Federal Practice & Procedure* § 1326 (3d ed.), and courts frequently allow parties to satisfy pleading requirements "by incorporating by reference

other paragraphs within the same complaint or counterclaim" *Empire Today, LLC v. Nat'l Floors Direct, Inc.*, 788 F. Supp. 2d 7, 22 (D. Mass. 2011).   The ultimate question regarding the sufficiency of pleadings under Rules 8 and 10 is "whether the theory and basis of the various counts are easily distinguishable." *Iowa Health Sys. v. Trinity Health Corp.*, 177 F. Supp. 2d 897, 906 (N.D. Iowa 2001) (internal quotation marks omitted).

Some courts have found violations of Rule 10(b), and required repleading of claims,[4] where "[e]xcessive incorporation by reference from one count to another" exists to such an extent that the other party "cannot reasonably be expected to respond" or where such incorporation "lead[s] to the introduction into the pleadings of considerable unnecessary matter." *Iowa Health Sys.*, 177 F. Supp. 2d at 906 (internal quotation marks omitted) (requiring repleading where counterclaims incorporated by reference all

---

[4] The Court notes that even where courts have concluded that excessive incorporation by reference exists, they have not found such incorporation to be a basis for dismissal, and have instead merely ordered that the offending party replead its claims, omitting the excessive incorporations by reference. *See, e.g.*, *Ledford v. Peeples*, 657 F.3d 1222, 1239 (11th Cir. 2011) (noting that dismissal is not the remedy for excessive incorporation by reference, explaining "[w]hen faced with a complaint like the one here, in which the counts incorporate by reference all previous allegations and counts, the district court must cull through the allegations, identify the claims, and, as to each claim identified, select the allegations that appear to be germane to the claim. This task can be avoided if the defendant moves the court for a more definite statement or if the court, acting on its own initiative, orders a repleader."); *Martin v. Gorajec*, Civ. No. 12-460, 2013 WL 319783, at *12 (S.D. Ind. Jan. 28, 2013) ("The term 'shotgun pleading' is used to describe complaints that utilize excessive incorporation, thereby taking advantage of Rule 10(b). . . . When faced with a shotgun pleading, an appropriate solution is to order a plaintiff to replead and state his claims more clearly."); *Iowa Health Sys.*, 177 F. Supp. 2d at 908 ("The remedy for excessive incorporation by reference, however . . . is not the dismissal of their Counterclaims in their entirety.  Rather, they should serve an amended reply and counterclaims separately stating and numbering their defenses and leaving out of their individual counterclaims incorporations by reference that are not simply incorporations by reference of factual allegations that lend further support to the individual counterclaims at issue." (emphasis, alterations, citation, and internal quotation marks omitted)).

previous paragraphs including affirmative defenses); *see also Destfino v. Kennedy*, Civ. No. 08-1269, 2009 WL 63566, \*4, \*7 (E.D. Cal. Jan. 8, 2009) (dismissing a complaint based on excessive incorporation by reference where the incorporation had the effect of causing the pleadings to "not specifically identify which defendant engaged in what in the fraudulent schemes" where the case involved "different representations . . . made by different persons to different people at different times" and "[y]et, the fraud allegations group all of the defendants together without specifying which defendants engaged in which conduct").

The remedy of repleader based on violation of Rules 8 and 10 has generally been reserved for egregious cases where "a defendant does not know the basic facts that constitute the claim for relief against it." *Terrell v. DIRECTV, LLC*, Civ. No. 12-81244, 2013 WL 451914, at \*2 (S.D. Fla. Feb. 6, 2013) (requiring amendment of a complaint where, among other deficiencies, the paragraphs were not numbered consecutively, several complaints had been merged into one, the complaint was repetitive and rambling, "[s]everal counts appear[ed] to be cut-off mid-count," and unnecessary statutes and regulations were attached as exhibits); *Allen v. Cypress Village, Ltd.*, Civ. No. 10-994, 2011 WL 1667055, at \*2 (M.D. Ala. May 3, 2011) (finding a complaint violated Rule 10(b) by incorporating every antecedent allegation by reference into each subsequent claim for relief where "[t]here are no counts, only a 'Prayer for Relief.' In that Prayer for Relief, Plaintiff's claims are crammed into a 300-word single sentence, connected by a plethora of commas. Reading between the commas, there appear to be no less than twenty-four claims. But deciphering what all of those claims are, which facts

are meant to support which claim, and how each Defendant is liable is an insurmountable task . . . ."); *In re Banks*, Bankr. No. 04-38360, 2008 WL 3979288, at *5 (Bankr. E.D. Va. Aug. 22, 2008) (dismissing with leave to amend for failure to comply with Rules 8(a) and 10(b) where "[p]aragraph 88 asserts causes of action under multiple code sections requesting judgment against 'appropriate defendants . . . under any theory of recovery . . . .'" because the pleading created confusion among multiple defendants by not specifying "which defendants are to be held liable for which code sections").

Here, the Court concludes that Monsanto's counterclaims meet the standards of Rules 8 and 10. The counterclaims contain 105 clearly numbered paragraphs of factual allegations. These allegations are followed by seven separate counts that, although they incorporate by reference the prior paragraphs in the counterclaims, explicitly state the basis for relief under each legal theory. These allegations are more than sufficient to put SEI on notice of the conduct for which Monsanto seeks to hold it liable, and therefore is not the type of pleading that violates Rules 8 and 10. *See Matheson Tri-Gas, Inc. v. Sheehan*, Civ. No. 11-401, 2011 WL 1832708, at *2 (M.D. Fla. May 13, 2011) (finding that "although each count incorporates by reference each factual allegation and each allegation of every preceding count, the complaint falls exceedingly short of a 'shotgun' pleading" because it "alleges discrete claims in separate counts and distinguishes among the three defendants" (internal quotation marks omitted)); *Chin v. DaimlerChrysler Corp.*, Civ. No. 95-5569, 2005 WL 5121812, at *2 (D.N.J. Dec. 5, 2005) (explaining that "broad incorporation by reference" of all prior allegations did not result in "neutralization of a clear and specific characterization of the action" and that "[i]ncorporation by

reference of all preceding allegations is such a common pleading technique that the Court does not feel comfortable in affording it the substantive significance that defendants seek"). To require Monsanto to replead its counterclaims would elevate form over substance in violation of Rule 8's liberal notice pleading requirements. That SEI understands the legal nature of Monsanto's individual counterclaims and the factual allegations that support them is perhaps best illustrated by SEI's coherent motion to dismiss which raises specific arguments against each of Monsanto's counterclaims. SEI's motion to dismiss indicates that "[t]he allegations are not so vague or ambiguous that a responsive pleading could not possibly be framed," *Streeter v. City of Pensacola*, Civ. No. 05-286, 2007 WL 4468705, at *2 (N.D. Fla. Dec. 18, 2007), and the Court will therefore deny SEI's motion to dismiss to the extent it seeks dismissal on the basis of over incorporation.

## III.    MONEY HAD AND RECEIVED[5]

In Count III, Monsanto brings a claim for money had and received alleging that "[t]hroughout the course of the parties' relationship, Monsanto paid to SEI approximately $6.7 million relating to the software development work that SEI was allegedly performing" and that "SEI's acceptance and retention of the $6.7 million was unjust as

---

[5] As an initial matter, the Court notes that it previously found that SEI's claims for breach of the Agreement and most of the related torts it alleges are governed by Missouri law pursuant to a choice of law clause in the Agreement. *Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017, 1031-32 (D. Minn. 2013). With respect to the present motion, the parties agree that Missouri law applies to most of Monsanto's counterclaims and have relied almost exclusively on Missouri law in their briefs. Accordingly, the Court will apply Missouri law to evaluate the substance of Monsanto's counterclaims unless otherwise noted.

SEI never provided to Monsanto a fully functional and scalable software product."
(Countercls. ¶¶ 119, 121.)  SEI moves to dismiss this claim on the basis that money had
and received is an equitable quasi-contract claim and provides relief only where no
express contract governs the relationship of the parties.  SEI argues that because the
"claim is based on nothing more than the existence of the written contract between the
parties, the obligation to perform under the contract, and monies paid pursuant to the
contract" it does not adequately plead alternative relief to Monsanto's breach of contract
claims, and must therefore be dismissed.  (Reply at 4, Dec. 19, 2013, Docket No. 103.)

To state a claim for money had and received, a plaintiff must allege that "(1) the
defendant received or obtained possession of the plaintiff's money; (2) the defendant
thereby appreciated a benefit; and (3) the defendant's acceptance and retention of the
money was unjust."  *Pitman v. City of Columbia*, 309 S.W.3d 395, 402 (Mo. Ct. App.
2010).  Claims for money had and received are founded upon equitable principles
whereby the law implies a contract to prevent unjust enrichment.  *Karpierz v. Easley*, 68
S.W.3d 565, 570 (Mo. Ct. App. 2002).  Under Missouri law, a party may not recover on
such an implied, or quasi-contract theory when a valid, express contract governs the
subject matter of the parties' dispute.  *See Al-Khaldiya Elecs. & Elec. Equip. Co. v.
Boeing Co.*, 571 F.3d 754, 759 (8th Cir. 2009); *Howard v. Turnbull*, 316 S.W.3d 431, 436
(Mo. Ct. App. 2010).

Although Missouri law prevents simultaneous **recovery** under both express
contract and quasi-contract claims, it "does not preclude that plaintiff from pleading both
theories in her complaint."  *Owen v. Gen. Motors Corp.*, Civ. No. 06-4067, 2006 WL

- 14 -

2808632, at *2 (W.D. Mo. Sept. 28, 2006). Indeed, the Federal Rules of Civil Procedure explicitly allow parties to include in their pleadings demands for alternative relief, "set out 2 or more statements of a claim or defense alternatively or hypothetically," and "state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(a)(3); *id.* 8(d)(2), (3). In reliance upon the Rule 8, federal courts in Missouri have consistently denied motions to dismiss quasi-contract claims even where the pleading also alleges the existence of an express contract. *See, e.g.*, *Level 3 Comm'cns, LLC v. Ill. Bell Tel. Co.*, Civ. No. 13-1080, 2014 WL 414908, at *6 (E.D. Mo. Feb. 4, 2014) (allowing claims for unjust enrichment and breach of contract to go forward at motion to dismiss stage); *Pollard v. Remington Arms Co.*, Civ. No. 13-0086, 2013 WL 3039797, at *7 (W.D. Mo. June 17, 2013) (denying defendant's motion to dismiss an unjust enrichment claim based on the existence of a contract "because the Federal Rules of Civil Procedure permit pleading in the alternative"); *Ozark Purchasing LLC v. Falcon Steering Sys., Inc.*, Civ. No. 12-3415, 2013 WL 708950, at *5 (W.D. Mo. Feb. 26, 2013) (same); *Franke v. Greene*, Civ. No. 11-1860, 2012 WL 3156577, at *5 (E.D. Mo. Aug. 2, 2012) (same).

SEI has cited no authority to the contrary. SEI relies upon a number of cases for the proposition that breach of contract and quasi-contract claims cannot coexist, but these cases do not deal with alternative claims presented at the motion to dismiss stage, but rather deal with situations where a party obtained double recovery under these alternative theories. *See A&L Underground, Inc. v. Leigh Constr., Inc.*, 162 S.W.3d 509, 510-11 (Mo. Ct. App. 2005) (reversing judgment on money had and received claim after a bench

trial because the parties "had an express contract"); *KC Excavating & Grading, Inc. v. Crane Constr. Co.*, 141 S.W.3d 401, 408 (Mo. Ct. App. 2004) (reversing judgment on quantum meruit claim entered after a bench trial because the trial court had also "found for KC Excavating on its breach of contract claim").[6]   Although SEI is correct that Monsanto **will** be "required to plead and prove damages outside the scope of the contract" to recover on its money had and received theory (Reply at 4), it is not required to do so at this motion to dismiss stage.   Accordingly, because Monsanto is allowed to plead in the alternative, the Court will deny SEI's motion to dismiss the money had and received counterclaim.

---

[6] SEI also argues that, although pleading in the alternative is generally allowed, where, as here, the existence of a contract is undisputed, then quasi-contract claims may not be pled in the alternative.   Specifically, SEI argues that Monsanto's counterclaim for money had and received must be dismissed because "[b]oth parties agree there is a valid enforceable contract and this Court has based its prior rulings on this point and it is appropriate to do so now."   (Reply at 4.) But SEI's argument misses the mark.   First, the Court has not based its prior rulings on the existence of a valid enforceable contract.   With the exception of the enforceability of the choice of law clause, the Court has made no determinations or reached any conclusions about the existence, validity, or scope of the Agreement but rather has assumed, for purposes of the motions to dismiss with which it has been confronted, the truth of the parties' allegations regarding the Agreement.   Second, SEI cites no authority, and the Court has found none, for the proposition that where the parties do not appear to dispute the existence of a valid contract, the parties to that lawsuit lose the ability to plead in the alternative.   SEI does cite *National Benefit Programs, Inc. v. Express Scripts, Inc.*, Civ. No. 10-907, 2011 WL 6945167 (E.D. Mo. Dec. 30, 2011), but that case was at the summary judgment stage where the court determined based on the record evidence that an express contract was applicable to plaintiff's claims for commissions and plaintiff then conceded that "its claims of unjust enrichment and promissory estoppel are precluded."   *Id.* at *5.   Finally, SEI's interpretation of the pleading requirements here based on its position that the existence of the Agreement is "undisputed" would undermine the purposes of pleading in the alternative.   In particular, although Monsanto has pleaded counterclaims based on the existence of the Agreement "the Court must also assume for the purposes of a motion to dismiss that the allegations necessary to the [quasi-contract] count are also true, namely that there was no valid contract.   A rule allowing for alternative pleading would be meaningless if the assumption of facts in favor of the plaintiff at the motion to dismiss stage of a lawsuit could foreclose mutually exclusive theories."   *Owen*, 2006 WL 2808632 at *2.

## IV.    FRAUDULENT INDUCEMENT AND NEGLIGENT INDUCEMENT

Monsanto brings separate counterclaims for fraudulent and negligent inducement.[7]

The heart of both claims is Monsanto's allegation that:

> Based on its business relationship with Monsanto, SEI had a duty to convey accurate and truthful information relating to its then-existing software product and its software development capabilities.  SEI further had a duty to disclose to Monsanto any pertinent limitations or issues it had in this regard.  Monsanto reasonably relied on SEI to provide truthful information relating to its existing software product and its development capabilities as SEI had superior knowledge relating to that information and the information could not have been discovered by Monsanto through the exercise of ordinary diligence.

(Countercls. ¶¶ 125, 140.)  For example, Monsanto alleges that prior to entering into the Agreement SEI misrepresented that it had "ample and capable software engineers and an infrastructure that allowed SEI to create innovative and complex solutions," "considerable experience in the agricultural industry," "the capability and necessary

---

[7] As an initial matter, the Court notes that contractual choice of law provisions like the one at issue here, which governs "any dispute arising from the performance or breach" of the Agreement, *see Superior Edge, Inc.*, 964 F. Supp. 2d at 1031, do not necessarily govern inducement claims because such claims arise before the contract is formed, *see Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 687-88 (8th Cir. 2001) (concluding that a choice of law clause providing that the "agreement shall be governed by and construed in accordance with the law of the State of Illinois" did not govern a claim for fraudulent concealment arising "out of the circumstances surrounding the formation of the contract"); *Smith v. Genetic Depot, Inc.*, Civ. No. 11-273, 2013 WL 627065, at *8-9 (D. Minn. Feb. 20, 2013) (finding that a contractual choice of law provision providing that the contract could be governed by the laws of Manitoba did not govern claims for negligent and fraudulent misrepresentation which related not "to the performance of the Multiplication Agreement, but the circumstances of formation of that Agreement" and instead applying forum law to analysis of those claims).  Here, however, both parties agree that Missouri law governs Monsanto's claims.   Because both parties have acquiesced to the application of Missouri law, the Court declines to undertake a sua sponte choice of law analysis, and will apply Missouri law.  *See Superior Edge, Inc.*, 964 F. Supp. 2d at 1034 (noting that "[w]hen parties acquiesce to the application of a particular state's law, courts need not address choice of law questions" (internal quotation marks omitted)).

infrastructure to develop software that would allow Monsanto sales representatives to pitch Monsanto products to farmers 'at their kitchen tables' through the use of electronic devices like iPads and laptops," "an advanced method to uniquely identify growers," and a software product that "used a proven configuration engine that had over 25 years of recommending, pricing and quoting extremely complex products." (*Id.* ¶¶ 126, 128-29, 141, 143-44.) With respect to its fraudulent inducement claim, Monsanto claims that SEI "knowingly" made a variety of "misleading representations about its existing software and its software development capabilities in order to induce Monsanto to enter into the Agreement." (*Id.* ¶ 124.) With respect to its negligent inducement claim, Monsanto argues with respect to those same misrepresentations that "SEI failed to exercise reasonable care or competence when it made misrepresentations about its existing software and its software development capabilities in order to induce Monsanto to enter into the Agreement." (*Id.* ¶ 139.)

## A. Duplicative Claims

SEI first argues that Missouri law does not treat claims for fraudulent and negligent inducement differently, and therefore Monsanto's claims "should be merged into one count" which "warrants dismissal" of the claims without prejudice. (Pl.'s Mem. in Supp. of Mot. to Dismiss at 7.) Specifically, SEI argues that the claims are duplicative because they both rely on the same universe of allegedly misrepresentative statements and omissions. (Reply at 5-6 (comparing Countcls. ¶¶ 126-131 with ¶¶ 141-146).)

Inducement claims are a subset of misrepresentation claims. *See Docmagic, Inc. v. Mortg. P'ship of Am., LLC*, Civ. No. 09-1779, 2010 WL 2326047, at *3 (E.D. Mo. June 8, 2010) (citing *Bracht v. Grushewsky*, 448 F. Supp. 2d 1103, 1110 (E.D. Mo. 2006); *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 763 (Mo. 2007) (en banc)). Under Missouri law

> [t]he elements of fraudulent misrepresentation are: 1) a false material representation; 2) the speaker's knowledge of the falsity of the misrepresentation or ignorance of the truth; 3) the speaker's intent that the hearer act upon the misrepresentation in a manner reasonably contemplated; 4) the hearer's ignorance of the falsity of the misrepresentation; 5) the hearer's reliance on its truth; 6) the hearer's right to rely thereon; and 7) the hearer's consequent and proximately caused damages.

*CADCO, Inc. v. Fleetwood Enters., Inc.*, 220 S.W.3d 426, 436 (Mo. Ct. App. 2007). The elements of negligent misrepresentation are:

> (1) speaker supplied information in the course of his business or because of some other pecuniary interest; (2) due to speaker's failure to exercise reasonable care or competence in obtaining or communicating this information, the information was false; (3) speaker intentionally provided the information for the guidance of a limited group of persons in a particular business transaction; (4) listener justifiably relied on the information; and (5) that as a result of listener's reliance on the statement, he/she suffered a pecuniary loss.

*Harris v. Smith*, 250 S.W.3d 804, 808 (Mo. Ct. App. 2008) (internal quotation marks omitted). Although these two claims are similar, Missouri courts have noted that there are two primary "differences between a cause of action for fraud and negligent misrepresentation; namely fraud 'requires that the person knowingly or recklessly supply false information and negligent misrepresentation requires that the information be supplied in the course of the defendant's business.'" *Leonard v. BASF Corp.*, Civ.

No. 06-33, 2006 WL 3702700, at *6 (E.D. Mo. Dec. 13, 2006) (alterations omitted) (quoting *Kesselring v. St. Louis Grp., Inc.*, 74 S.W.3d 809, 813 (Mo. Ct. App. 2002)).

In light of the authority from Missouri courts, it is clear that Missouri recognizes distinct causes of action for fraudulent and negligent misrepresentations and Monsanto is therefore permitted to allege both claims.  Additionally, as explained above, the Federal Rules allow Monsanto to plead in the alternative, and therefore dismissal is not warranted even though Monsanto's claims for fraudulent and negligent inducement are based on the same universe of statements and omissions.  *See Williams v. Fin. Plaza, Inc.*, 78 S.W.3d 175, 186 (Mo. Ct. App. 2002) (noting that negligent misrepresentation can be pled as an "alternative theory" to a fraudulent misrepresentation claim).  Here, it is possible that discovery will reveal that SEI knowingly supplied false information and Monsanto will prevail on its fraudulent inducement theory.  It is alternatively possible that discovery will show that SEI did not knowingly supply false information, but instead supplied information without exercising reasonable care with respect to the information's falsity and therefore may be liable for negligent inducement.  At this motion to dismiss stage, the Court must accept the facts in Monsanto's alternative claims as true, and will deny SEI's motion to dismiss to the extent it contends that dismissal is warranted because Monsanto's fraudulent and negligent inducement claims must be merged.

## B.     Economic Loss Rule

SEI next argues that Monsanto's claims for fraudulent and negligent inducement are barred by the economic loss rule because the claims are identical to Monsanto's

claims based on breach of the Agreement.  "The economic loss doctrine prohibits a party 'from seeking to recover in tort for economic losses that are contractual in nature.'" *Graham Constr. Servs., Inc. v. Hammer & Steel Inc.*, --- F.3d ---, Nos. 13-1843, 13-1906, 2014 WL 2619717, at *3 (8th Cir. June 13, 2014) (quoting *Autry Morian Chevrolet Cadillac, Inc. v. RJF Agencies, Inc.*, 332 S.W.3d 184, 192 (Mo. Ct. App. 2010)).  The economic loss doctrine seeks to preserve a distinction between contract law and tort law and recognizes that contract law "is better suited for dealing with purely economic loss in the commercial arena than tort law, because it permits the parties to specify the terms of their bargain and to thereby protect themselves from commercial risk." *Dannix Painting, LLC v. Sherwin-Williams Co.*, 732 F.3d 902, 906 (8th Cir. 2013) (internal quotation marks omitted).

But the economic loss doctrine does not "categorically" bar fraud and misrepresentation claims that arise in cases involving contractual relationships.  *AKA Distrib. Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1086 (8th Cir. 1998) *cited with approval in Compass Bank v. Eager Rd. Assocs., LLC*, 922 F. Supp. 2d 818, 827 (E.D. Mo. 2013); *Self v. Equilon Enters., LLC*, Civ. No. 00-1903, 2005 WL 3763533, at *11 (E.D. Mo. Mar. 30, 2005).  Instead, most courts have allowed tort claims to go forward where they are "based upon a misrepresentation that was outside of or collateral to the contract, such as many claims of fraudulent inducement." *Id.*; *see also Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (explaining that a plaintiff may maintain a claim of fraud by "demonstrat[ing] a fraudulent misrepresentation collateral or extraneous to the contract").  Although the Missouri Supreme Court has not

addressed the operation of the economic loss doctrine in the context of a claim for fraudulent or negligent inducement,[8] federal courts have predicted that in ascertaining whether such claims are independent of the contract for purposes of the economic loss doctrine, Missouri courts would be guided by "[t]wo critical factors . . . (1) whether the subject matter of the alleged misrepresentations was incorporated into the parties' contract" and "(2) whether the plaintiff suffered additional damages outside the contract as a result of the alleged fraud." *Compass Bank*, 922 F. Supp. 2d at 827 (citing *AKA Distrib.*, 137 F.3d at 1087; *Bridgestone/Firestone*, 98 F.3d at 20).

Relying on *Compass Bank*, SEI argues that because the alleged misrepresentations that form the basis of Monsanto's inducement claims relate to the subject matter of the Agreement – in that they both largely pertain to the nature of software that SEI agreed to develop for Monsanto – the inducement claims are barred by the economic loss doctrine. But it is not enough to warrant dismissal on the basis of the economic loss doctrine for the subject matter of the misrepresentation to merely be referenced in the parties' contract. To the extent *Compass Bank* can be interpreted as holding that, it reflects an overly narrow view of misrepresentations that are outside of or collateral to a contract. Indeed, such an interpretation would unduly restrict the types of fraudulent inducement

---

[8] The Court notes that Missouri law regarding the economic loss doctrine is somewhat unclear, and courts have therefore looked broadly to other jurisdictions to anticipate the scope and substance of Missouri's economic loss doctrine jurisprudence. *See Dannix Painting, LLC*, 732 F.3d at 905-06 (anticipating "how the Missouri Supreme Court would rule" on an issue involving the economic loss doctrine and citing Illinois, Minnesota, and North Dakota law); *Bruce Martin Constr., Inc. v. CTB, Inc.*, Civ. No. 10-205, 2012 WL 718624, at *3 (E.D. Mo. Mar. 6 2012) ("State and federal case law relating to the economic loss doctrine in Missouri is fairly complex and somewhat contradictory.").

claims that could be brought, as many fraudulent inducement claims will be based upon misrepresentations that are in some way referenced in the subject matter of the contract, as, in order to present a fraudulent inducement claim at all, the misrepresentations must be material to the contract. *See Scott Salvage Yard, LLC v. Gifford*, 382 S.W.3d 134, 138 (Mo. Ct. App. 2012) (noting that plaintiff stated a claim for fraudulent inducement to enter a contract regarding payment for crushing of cars where he alleged that defendant "intentionally misrepresented the number of cars he had available for crushing and that such fact was material to the contract"); *Evergreen Nat'l Corp. v. Carr*, 129 S.W.3d 492, 496 (Mo. Ct. App. 2004) (noting that an essential element of fraudulent inducement is the "materiality" of the statement, and describing a claim or fraudulent inducement where plaintiff alleged he was induced to buy certain lots "because of fraudulent misrepresentations regarding the lots").

Rather than looking generally to whether the subject matter of the alleged misrepresentations and the at-issue contract are the same, most courts have focused more precisely on whether a contract term conflicts with or contains the alleged misrepresentation, in which case the inducement claim is barred. Where a contract term contains or conflicts with an alleged misrepresentation, the contract term controls, and there is no fraudulent misrepresentation claim. *See AKA Distrib. Co.*, 137 F.3d at 1087 (finding that a fraud claim could not be based on defendant's representation that plaintiff would be its distributor "for a long time" when "duration was a term of the contract"). Similarly, courts have found that misrepresentations as to a party's intention to perform its obligations under a contract are not actionable under an inducement theory, as the

terms of a party's performance are contained in the contract and misrepresentations about an intent to perform that manifest in a failure to perform can be remedied through a breach of contract action. *See Bridgestone/Firestone, Inc.*, 98 F.3d at 19-20 (finding representations that the party intended to remit all sums due and owing to plaintiff under a contract "amount to little more than intentionally-false statements" by the party "indicating his intent to perform under the contract" which were insufficient to support a claim for fraud).

Although courts have almost uniformly found claims based on misrepresentations about a party's **intent** to perform to be barred by the economic loss doctrine, many have carefully distinguished between those claims – which are barred – and claims that are based upon misrepresentations of existing facts prior to contracting that induce the opposing party to enter into the contract – which are not always barred. *See Scott Salvage Yard, LLC*, 382 S.W.3d at 136, 138 (explaining that although "non-performance of a contractual promise during the pendency of a contract does not constitute fraud" plaintiff stated a claim for fraudulent inducement where prior to entering into a contract regarding payment for crushed cars, the defendant misrepresented the number of cars he had available for crushing); *Quanzhou Joerga Fashion Co. v. Brooks Fitch Apparel Grp., LLC*, Civ. No. 10-9078, 2011 WL 4063344, at *7 (S.D.N.Y. Aug. 11, 2011) ("[I]n practice the courts have held with consistency that representations that the party will comply with the terms of a contract are referable to the contract and hence neither collateral nor extraneous to that contract. In contrast, if the representation concerns present facts (that is, other than the party's present intention to comply with the contract

in the future), the representation may trigger tort liability if the other criteria for such liability are satisfied." (citations omitted)).

With respect to the types of misrepresentations alleged here – about SEI's capabilities, personnel, infrastructure, and experience in the field – which go to a party's **ability** to perform the contract, some courts have allowed such claims to go forward on the basis that they allege misrepresentations related to the inducement of the contract not the performance of its terms.  *See United States v. 1,577.28 Acres of Land in Osage Cnty., Kan.*, 486 F.2d 445, 448 (10th Cir. 1973) ("[W]here, as here, an unconditional promise is made as an inducement to enter a contract, and the promisor is without knowledge as to his ability to perform, or knows or should know of his prospective inability to perform, such a promise constitutes an actionable misrepresentation."); *PPG Indus., Inc. v. Generon IGS, Inc.*, 760 F. Supp. 2d 520, 527-28 (W.D. Pa. 2011) (denying a motion to dismiss a counterclaim for fraudulent inducement based on allegations that defendant "was fraudulently induced into entering the supply agreement through Plaintiff's misrepresentations of its own capabilities to perform under the contract" because to the extent those allegations related to inducement rather than performance they stated a claim).[9]  In *MeterLogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346

---

[9] *But see Compass Bank*, 922 F. Supp. 2d at 827 ("Plaintiffs allege that Defendants made pre-contract misrepresentations with respect to their ability to perform obligations that became part of the parties' contract.  These asserted misrepresentations – concerning subject matter incorporated within the four corners of the contract – are insufficient to state a claim for fraud."); *Tier1 Innovation, LLC v. Expert Tech. Grp., LP*, Civ. No. 06-4622, 2007 WL 1377664, at *4 (E.D. Pa. May 8, 2007) (dismissing claims for fraudulent and negligent misrepresentation as "inextricably intertwined" with the party's "alleged failure to perform under the contract, as the

(Footnote continued on next page.)

(S.D. Fla. 2000), for example, the court found that plaintiff had stated a claim for fraudulent inducement independent of a contract where prior to contracting defendants had represented that their corporate parents "were firmly behind their proposed business arrangements, had funded the development of the technology, and owned the technology." *Id.* at 1362 (alterations and internal quotation marks omitted).  The court distinguished these allegations from the non-actionable allegations that defendants promised "to develop, manufacture, provide, and service certain technology" because these promises were nothing more than the performance required of defendants under the contract.  *Id.*  The court found that the allegations regarding the involvement of the corporate parents were the type that required an exception to the economic loss rule, explaining:

> The ability of MeterLogic to negotiate fair terms and make a truly informed decision has been undermined by these misrepresentations.  For example, had MeterLogic known that [the corporate parents] were not really behind the contracts, MeterLogic could have protected itself by agreeing to different terms or refusing to enter into the agreements altogether.

*Id.*

With these principles in mind, the Court concludes that a Missouri court would allow Monsanto's fraudulent and negligent inducement claims to go forward based on at least some of the misrepresentations alleged in Monsanto's counterclaims, and will therefore deny SEI's motion to dismiss.  Certainly some of the misrepresentations alleged

---

(Footnote continued.)

claims pertain to [the party]'s representations regarding its expertise and ability to perform its duties under the agreement between the parties").

by Monsanto were incorporated in the Agreement, and therefore cannot form the basis of a fraudulent inducement claim.  For example, Monsanto alleges that SEI represented that it had a Sales Edge product which "included software, date and Intellectual Property that was delivered over the internet."  (Countcls. ¶¶ 128, 143.)  But the Agreement explicitly incorporates this alleged misrepresentation, stating "SEI has an existing sales enhancement product, SalesEdge Accelerator comprised of software, data and Intellectual property which is delivered over the internet."  (Compl., Ex. B at 11.)  To the extent that SEI did not have such a product or it was not comprised of those elements, Monsanto has a breach of contract, not a fraud claim.[10]  Other alleged misrepresentations about SEI's **ability** to perform, however, are not memorialized in the Agreement, and allege more than simply a misrepresentation as to SEI's intent to perform.  For example, Monsanto alleges that SEI represented that it "had considerable experience in the agricultural industry," had "an infrastructure that allowed SEI to create innovative and complex solutions," "could provide grower data," "had experience using the 'Agile Methodology' and 'Agile Process,'" and that SalesEdge "permitted users to create personalized sales

---

[10] SEI also argues that Monsanto's counterclaims for inducement are barred by the merger clause in the Agreement which provides that "this Agreement, together with the Exhibits and attachments hereto, constitute the entire agreement, both written or oral, with respect to the subject matter hereof, and supersedes all prior or contemporaneous understandings or agreements, whether written or oral, between Monsanto and SEI with respect to such subject matter."  (Compl., Ex. B at 40.)  But "the rule that all prior and contemporaneous oral agreements and representations are merged in the written contract entered into by the parties does not apply to fraudulent representations made for the purpose of inducing a party to enter into such contract."  *Riley v. Lucas Lofts Investors, LLC*, 412 S.W.3d 285, 293 (Mo. Ct. App. 2013) (alteration and internal quotation marks omitted).  Therefore, the merger clause does not require dismissal of Monsanto's inducement claims.

proposals – sometimes printed in binder or booklet form – using data from a wide range of sources with the data being tailored to the specific industry, seller and purchaser." (Countercls. ¶¶ 126, 128, 131, 141, 143, 146.)[11]   These allegations are not simply allegations that SEI promised it would perform its duties under the contract, and then failed to perform.   Instead, the allegations relate to misrepresentations that SEI made about its abilities, skills, and experience prior to entering into the Agreement with Monsanto.   These misrepresentations, Monsanto alleges, induced Monsanto to enter into the Agreement with SEI.   If Monsanto had known the truth about SEI's capabilities it may have chosen to add, subtract, or change terms in the Agreement, or decline to enter into the Agreement altogether.   Although somewhat nuanced, the difference is significant here.   If SEI had merely promised to perform and failed to do so, remedies available under a breach of contract theory would make Monsanto whole.   Additionally, in such a situation, Monsanto would have been able to specify the terms of the bargain and protect itself from risk by including certain terms of performance in the contract.   But if SEI

---

[11]   It is certainly possible that, depending on the context in which some of these misrepresentations were made, that certain of them – such as claims that SEI was "on the cutting edge of technology" and that its solution "leapfrogs current approaches" (Countercls. ¶¶ 126, 130, 141, 145) may ultimately not be actionable as "mere expressions of opinion or 'puffing'" such as representations "that compare the efficiency, economy or quality of one product to other products." *Midwest Printing, Inc. v. AM Int'l Inc.*, 108 F.3d 168, 170-71 (8th Cir. 1997); *see also Trotter's Corp. v. Ringleader Restaurants, Inc.*, 929 S.W.2d 935, 940 (Mo. Ct. App. 1996) ("Mere statements of opinion, expectations, and predictions for the future are insufficient to authorize a recovery for fraudulent misrepresentation.").   The Court declines to dismiss Monsanto's claims based on particular representations that may constitute opinions or puffing, as SEI has not requested dismissal on this basis.   Furthermore, as explained below, that certain of Monsanto's alleged misrepresentations may not ultimately establish an actionable fraud claim does not warrant dismissal where, as here, many of the misrepresentations alleged do state a claim, and whether the statements constitute actionable fraud depends on context and other facts to be identified in discovery.

misrepresented its abilities, and thereby induced Monsanto to enter into the contract in the first instance, the purposes of the economic loss rule are no longer implicated, because in the absence of truthful information, Monsanto would not have been able to specify certain terms in the Agreement to protect itself from commercial risk. *See MeterLogic, Inc.*, 126 F. Supp. 2d at 1362. Because, accepting the facts in the counterclaims as true and drawing all inferences in Monsanto's favor, Monsanto has stated a plausible claim for relief under theories of fraudulent and negligent inducement, the Court will deny SEI's motion to dismiss.[12]

---

[12] In apparent reliance on *Compass Bank*, SEI argues that in addition to showing that the misrepresentations relied upon as support for its inducement claims are independent of the Agreement, Monsanto must also show special damages to avoid dismissal. 922 F. Supp. 2d at 827 (explaining the two critical factors examined by courts as "(1) whether the subject matter of the alleged misrepresentations was incorporated into the parties' contract **and** (2) whether the plaintiff suffered additional damages outside the contract as a result of the alleged fraud" (citation omitted) (emphasis added)). But *Compass Bank* did not hold that both elements were required to state a claim for inducement, and instead specifically characterized the two inquiries as "factors" to be examined by the Court. *Id.* Additionally, in setting out these factors *Compass Bank* explicitly relied on *AKA Distribution Co.* and *Bridgestone/Firestone, Inc.*, neither of which required that the claimant demonstrate misrepresentations independent of the contract as well as special damages in order to proceed on an inducement theory. *See AKA Distrib. Co.*, 137 F.3d at 1087 (examining only whether the subject matter was independent of the contract in ascertaining whether a fraud claim was barred by the economic loss doctrine); *Bridgestone/Firestone, Inc.*, 98 F.3d at 20 (explaining that "[t]o maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; **or** (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; **or** (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages" (citations omitted) (emphasis added)). Therefore, the Court concludes that it is sufficient at this stage that Monsanto allege a misrepresentation independent of the Agreement. Although Monsanto will not be allowed double recovery of the same damages on two legal theories, that is an issue for the election of remedies phase of this action, not a motion to dismiss. Furthermore, Monsanto has alleged damages such as "investment of thousands of hours of time and other resources in an effort to try and make the project with SEI succeed, mitigation expenses and the resulting distractions" as well as "having to engage co-defendant SST to work separately on a software application that would provide Monsanto with the same functionality that SEI had committed to provide under the Agreement." (Countercls. ¶¶ 136-37, 151-52.)

(Footnote continued on next page.)

As a final matter, for purposes of this motion, and in light of Monsanto's lengthy, detailed, and somewhat repetitive allegations, the Court notes that it need not parse each of Monsanto's allegations to determine precisely which alleged misrepresentations state a claim and which do not.  It is sufficient at this stage to determine, as the Court has, that some aspects of Monsanto's fraudulent and negligent inducement allegations state a plausible claim for relief and therefore are sufficient to survive a motion to dismiss. Because of the somewhat closely drawn distinctions between claims for fraud arising out of inducement to contract versus performance of that contract, courts have been very reluctant to dismiss when, based on the allegations, it would be possible for a claimant to demonstrate that the misrepresentations related to the inducement.  *See U.S. Claims, Inc. v. Saffren & Weinberg, LLP*, Civ. No. 07-0543, 2007 WL 4225536, at *12 (E.D. Pa. Nov. 29, 2007) ("[C]ourts have shown some reluctance to dismiss claims for fraud in the inducement or negligent misrepresentation early in the litigation . . . . Absent further discovery, this Court cannot accurately determine whether Plaintiff's claims of fraudulent inducement are collateral to or interwoven in the contract with Defendants. . . . It is precisely that uncertainty, that makes it inappropriate to dismiss the fraud counts before the parties have an opportunity to conduct discovery."); *Carlone v. The Lion & The Bull Films, Inc.*, 861 F. Supp. 2d 312, 326 (S.D.N.Y. 2012) (finding that, even at the summary

_____
(Footnote continued.)

Although these are the same damages claimed for breach of the Agreement (*id.* ¶¶ 104-05), to the extent some or all of these damages are not recoverable under contract they could form the basis for recovery under the inducement theories.

judgment stage, "it is not established by undisputed fact that Plaintiff's fraudulent inducement claim is sufficiently distinct from the breach of contract claim to warrant separate relief"); *cf. R.W. Murray Co. v. Shatterproof Glass Corp.*, 697 F.2d 818, 829 (8th Cir. 1983) (applying Missouri law to an inducement claim alleging that defendant "misrepresented the quality of the glass panels it designed, manufactured and supplied for appellants' building," and, although not directly addressing the economic loss doctrine, explaining "we believe that appellants sufficiently alleged the required elements to state a cause of action for fraud in the inducement to contract. Although we may have some doubts that the appellants will be able to prove all of the facts necessary to establish these elements, such doubts are not the proper basis for granting a Rule 12(b)(6) motion to dismiss for failure to state a cause of action."). Reducing Monsanto's allegations to those precise misrepresentations which are independent or collateral to the Agreement is a task best undertaken after discovery has occurred – which may lead to the discovery of facts that clarify, provide context for, and/or eliminate Monsanto's claims based on particular misrepresentations. Accordingly, the Court will allow Monsanto's inducement claims to proceed, but cautions that claims based on misrepresentations contained or contradicted by the Agreement and those which merely allege misrepresentations of SEI's intent to perform will be subject to dismissal at a later stage.

## V.     CONVERSION

Monsanto's counterclaim for conversion arises out of its allegation that pursuant to the Agreement "Monsanto is the owner of any Intellectual Property associated with the

Monsanto Premium Products that is developed under the Agreement, including but not limited to, software source code." (Countercls. ¶ 155.) Monsanto further alleges that "SEI has possession of the Intellectual Property, including but not limited to, the software source code, and has deprived Monsanto of its right to the Intellectual Property." (*Id.* ¶ 156.) Finally, Monsanto alleges that it made "[a] demand for the Intellectual Property, including but not limited to, the software source code . . . on a number of different occasions throughout 2011, but SEI has refused to relinquish the Intellectual Property." (*Id.* ¶ 157.)

"Conversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights." *Emerick v. Mut. Benefit Life Ins. Co.*, 756 S.W.2d 513, 523 (Mo. 1988). To state a claim for conversion, a plaintiff must allege that "(1) plaintiff was the owner of the property or entitled to its possession; (2) defendant took possession of the property with the intent to exercise some control over it; and (3) defendant thereby deprived plaintiff of the right to possession." *JEP Enters., Inc. v. Wehrenberg, Inc.*, 42 S.W.3d 773, 776 (Mo. Ct. App. 2001). Where a party's possession of property is initially lawful, wrongful refusal to return the property to its owner can also be actionable under a theory of conversion. *See Green Valley Seed, Inc. v. Plenge*, 72 S.W.3d 601, 603 (Mo. Ct. App. 2002); *see also Emerick*, 756 S.W.2d at 525. To succeed on a conversion claim based on wrongful refusal to return, the claimant must allege as an element of the claim that a demand for return of the property was made. *Green Valley Seed*, 72 S.W.3d at 603.

SEI argues that Monsanto's claim must be dismissed for two reasons.  First, SEI argues that Monsanto is not the owner of the intellectual property at issue because "[t]here is no language within the body of the Agreement or any other agreement that conveys such ownership," and instead the Agreement only provides Monsanto with a right to use and access the intellectual property.  (Mem. in Supp. of Mot. to Dismiss at 10.)  Second, SEI argues that Monsanto's conversion claim fails because it fails to allege the "loss of possession of physical, tangible property," and instead alleges conversion of "an idea."  (*Id.* at 12.)

With respect to SEI's first argument, the Court concludes that there is sufficient language in the Agreement to render Monsanto's claim of ownership to the intellectual property plausible at this motion to dismiss stage.  Although SEI cites at length various provisions of the Agreement governing licenses and user fees, the Agreement also provides that:

> Regardless of inventorship, any Intellectual Property associated with the Monsanto Premium Products or any solution in the Monsanto Exclusive Field that is developed under this Agreement will be assigned to Monsanto. . . .  SEI will be entitled to receive a limited, royalty-free license to use the Intellectual Property associated with the Monsanto Premium Products outside of the Monsanto Exclusive Field, and to grant appropriate sublicense if required.

(Compl., Ex. B at 25.)   Disputes about the import of this provision, its potential ambiguity, scope, and interaction with other provisions in the Agreement are not questions to be resolved on a motion to dismiss.  Accepting Monsanto's factual allegations in its counterclaims as true, in conjunction with the provision of the Agreement assigning to Monsanto ownership rights in all intellectual property developed

under the Agreement, the Court concludes that Monsanto has adequately alleged an ownership interest in the allegedly converted property.

SEI's second argument also misses the mark.   SEI essentially contends that Monsanto's conversion claim must be dismissed because the Court previously dismissed SEI's conversion claim based on the theory that conversion of an idea is not actionable. SEI brought a conversion claim against Monsanto based on, among others, the allegation that Monsanto had unlawfully retained copies of SEI's software.   *Superior Edge, Inc.*, 964 F. Supp. 2d at 1038.   The Court dismissed SEI's claim to the extent it was based upon "Monsanto's retention of SEI's intellectual property . . . because 'conversion does not lie for the appropriation of an idea.'"   *Id.* at 1039 (quoting *Schaefer v. Spence*, 813 S.W.2d 92, 96 (Mo. Ct. App. 1991)).   The Court explained that "[c]onversion of intangible property cannot occur where the plaintiff still has the information that the defendant allegedly appropriated."   *Id.* (citing *Monsanto Co. v. Hill*, Civ. No. 03-181, 2004 WL 4996339, at *4-5 (E.D. Mo. May 21 2004)).   Therefore, the Court concluded that "[h]ere, SEI does not dispute that it retains the software it created during the course of the Agreement.   Monsanto's retention of any intellectual property did not, therefore, deprive SEI of possession and cannot be the basis of a conversion claim."   *Id.*

Monsanto's conversion claim is essentially the opposite of SEI's claim.   Here, unlike with SEI's claim, Monsanto does not claim that it still has the information that SEI allegedly appropriated.   Also unlike SEI, Monsanto does not allege that it retains the software that SEI created during the course of the Agreement.   Instead, Monsanto's claim is based upon loss of possession of the intellectual property and source code to which the

Agreement granted it an ownership interest; not loss of a copy or loss of exclusivity, but loss of the actual software and source code itself.  This is sufficient to state a claim for conversion.  *See Mayo Clinic v. Elkin*, Civ. No. 09-322, 2010 WL 760728, at *5 n.12 (D. Minn. Mar. 4, 2010) (explaining that a conversion claim survived summary judgment based on a dispute over the ownership of software and source code); *Abundance Partners LP v. Quamtel, Inc.*, 840 F. Supp. 2d 758, 772 (S.D.N.Y. 2012) (denying a motion to dismiss a conversion claim based on conversion of source code).[13]  Accordingly, the Court will deny SEI's motion to dismiss Monsanto's counterclaim for conversion.

## VI.   PROFESSIONAL NEGLIGENCE

In support of its counterclaim for professional negligence, Monsanto alleges that "SEI is held to a standard of care as a member of a learned and skilled profession and had a duty to exercise the ordinary and reasonable technical skill that is usually exercised by those in the software development field."  (Countercls. ¶ 161.)  Monsanto further alleges that "[b]y failing to timely deliver a fully functional and scalable software product in a timely manner, SEI deviated from the standard of care and that deviation was the proximate cause of Monsanto's damages."  (*Id.* ¶ 162.)

---

[13] Relatedly, SEI argues that Monsanto "never had possession of the source code" and therefore its conversion claim must fail.  (Reply at 11.)  But conversion requires only that the plaintiff allege he was "entitled" to possession of property and that the defendant "deprived plaintiff of **the right to** possession."  *JEP Enters., Inc.*, 42 S.W.3d at 776 (emphasis added).  Therefore, SEI is not required to plead that it actually ever had possession of the intellectual property and source code.  *See Emerick*, 756 S.W.2d at 526 ("A plaintiff charging conversion must show possession or the right to possession, or an ownership which carries with it the right to immediate possession.").

As an initial matter, SEI argues that Minnesota rather than Missouri law should govern the professional negligence counterclaim.  Because the Court concludes that the claim is subject to dismissal under either state's law, it need not determine whether the choice of law clause in the Agreement is broad enough to encompass claims for professional negligence.  "An action for professional negligence exists where, in the context of the contractual relationship, the professional negligently discharges the duties arising from that relationship." *Rosemann v. Sigillito*, 956 F. Supp. 2d 1082, 1109 (E.D. Mo. 2013).  With respect to the duty of care in professional negligence claims "'[o]ne who undertakes to render professional services is under a duty . . . to exercise such care, skill, and diligence as men in that profession ordinarily exercise under like circumstances.'" *Pond Hollow Homeowners Ass'n v. The Ryland Grp., Inc.*, 779 N.W.2d 920 (Minn. Ct. App. 2010) (alterations in original) (quoting *City of Eveleth v. Ruble*, 225 N.W.2d 521, 524 (Minn. 1974)); *see also Murphy v. A.A. Mathews, a Div. of CRS Grp. Eng'rs, Inc.*, 841 S.W.2d 671, 674 (Mo. 1992) (en banc).

Minnesota and Missouri courts have recognized claims for professional negligence against professionals such as attorneys, architects, accountants, and engineers.  *See, e.g.*, Minn. Stat. § 544.42, subd. 1(1); *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 184 (Minn. 1999) (accountants); *Pond Hollow Homeowners Ass'n*, 779 N.W.2d at 923 (engineer); *Children's Wish Found. Int'l, Inc. v. Mayer Hoffman McCann, P.C.*, 331 S.W.3d 648, 649 (Mo. 2011) (accountants); *Blackstock v. Kohn*, 994 S.W.2d 947, 950 (Mo. 1999) (attorneys) *Brennan v. St. Louis Zoological Park*, 882 S.W.2d 271, 273 (Mo. Ct. App. 1994) (architect).  Courts have occasionally suggested that the scope of

professional negligence claims might include other similar professionals, such as roofing companies, *see Trident Grp., LLC v. Miss. Valley Roofing, Inc.*, 279 S.W.3d 192, 197 (Mo. Ct. App. 2009), or real estate appraisers, *Dueker v. Gill*, 175 S.W.3d 662, 669 & n.6 (Mo. Ct. App. 2005) (noting in the context of a negligent misrepresentation claim that "there is some general authority that commercial real estate appraisers may be held liable for negligent misrepresentation" (internal quotation marks omitted)).

Neither the Minnesota nor Missouri Supreme Court has ever recognized a cause of action for professional negligence against providers of computer-related services or products. Of the courts to consider the question, the overwhelming majority have determined that a malpractice or professional negligence claim does not lie against computer consultants or programmers. *See Avazpour Networking Servs., Inc. v. Falconstor Software, Inc.*, 937 F. Supp. 2d 355, 364 (E.D.N.Y. 2013) ("New York law is clear in limiting imposition of a duty, the breach of which can support a claim in tort, to a limited class of professionals and circumstances. Falconstor is a provider of computer software, hardware and related installation services. While such goods and services require specialized knowledge, New York state law does not recognize a cause of action for professional malpractice by computer consultants." (internal quotation marks omitted)); *Ferris & Salter, P.C. v. Thomson Reuters Corp.*, 889 F. Supp. 2d 1149, 1153 (D. Minn. 2012) (predicting that the Minnesota Supreme Court would not recognize a cause of action for malpractice against computer consultants explaining that there is "no indication that Minnesota has imposed upon computer consultants a heightened standard of care" and does not require licensing or continuing education requirements for

providers of computer-related services); *Heidtman Steel Prods., Inc. v. Compuware Corp.*, Civ. No. 07-7389, 2000 WL 621144, at *14 (N.D. Ohio Feb. 15, 2000) ("Michigan courts have disallowed malpractice claims against nurses, morticians, and newspaper publishers because these occupations, though involving great skill, are not 'professions' as the term is used doctrinally. . . . There is no precedent in Michigan to recognizing computer consultants as professionals. Thus, computer consultants cannot be held liable for malpractice." (footnote omitted)); *Rapidigm, Inc. v. ATM Mgmt. Servs., LLC*, 63 Pa. D. & C.4th 234, 247-49 (Pa. Com. Pl. 2003); *Racine Cnty. v. Oracular Milwaukee, Inc.*, 767 N.W.2d 280, 286 (Wis. Ct. App. 2009).

In deciding that computer professionals are not subject to professional negligence claims, courts to consider the question have often relied upon the reasoning of Raymond T. Nimmer in his treatise *The Law of Computer Technology*, who explains:

> Most practitioners in computer consulting, design, and programming do not fit a model that creates malpractice liability.  These businesses and 'professional' parties clearly engage in complex and technically sophisticated activities.  Computer programmers commonly define themselves as 'professionals.'  Yet, despite the complexity of the work, computer programming and consultation lack the indicia associated with professional status for purposes of imposing higher standards of reasonable care.  While programming requires significant skill and effective consultation requires substantial business and technical knowledge, the ability to practice either calling is not restricted or regulated at present by state licensing laws.  If anything, programming skills have proliferated throughout the general public during the past decade and become less, rather than more, the exclusive domain of a profession specially trained and regulated to the task.  Unlike traditional professions, while practitioner associations exist, there is no substantial self-regulation or standardization of training within the programming or consulting professions.

*Ferris & Salter, P.C.*, 889 F. Supp. 2d at 1152 (quoting Raymond T. Nimmer, *The Law of Computer Tech.* § 9.30 (4th ed. 2012)).   Additionally, courts have rejected the argument that computer professionals should be subject to professional negligence claims on the basis that they are not subject to licensing or regulation by states, explaining:

> Professionals may be sued for malpractice because the higher standards of care imposed on them by their profession and by state licensing requirements engenders trust in them by clients that is not the norm of the marketplace.  When no such higher code of ethics binds a person, such trust is unwarranted.  Hence, no duties independent of those created by contract or under ordinary tort principles are imposed on them.

*Hosp. Computer Sys., Inc. v. Staten Island Hosp.*, 788 F. Supp. 1351, 1361 (D.N.J. 1992).

Here, Monsanto has provided no reason why the Missouri Supreme Court would deviate from the reasoning of these cases.  For example, Monsanto has not pointed to any Missouri law which expansively defines a professional negligence action as including any profession that involves complicated or skilled work.   Additionally, Monsanto has not identified any Missouri statute or regulation requiring computer professionals to obtain licenses or complete continuing education, which might thereby suggest that Missouri courts would treat computer professionals like attorneys, architects, or accountants.  Nor has Monsanto presented any argument that computer professionals are subject to self-regulation in Missouri.  Instead, Monsanto argues only that "[b]ased on the facts presented in this case, Monsanto believes that the Missouri Supreme Court would permit a claim for professional negligence against SEI."  (Monsanto's Mem. in Opp'n to

Mot. to Dismiss at 17 n.5, Nov. 25, 2013, Docket No. 96.)[14]  As support Monsanto cites

*Diversified Graphics, Ltd. v. Groves*, 868 F.2d 293 (8th Cir. 1989), but that case was a

professional negligence action against an accounting firm that acted as a consultant for

the client's purchase and implementation of an in-house computerized data processing

system.  *Id.* at 296-97.  The availability of professional negligence actions against

accountants is already well-established under Missouri law, and *Diversified* says nothing

about whether a professional negligence action against a computer professional – not

acting in a role as an accountant – is appropriate.  Monsanto also relies on *Data*

*Processing Services, Inc. v. L.H. Smith Oil Corp.*, 492 N.E.2d 314 (Ind. Ct. App. 1986),

*overruled on other grounds by Insul-Mark Midwest v. Modern Materials*, 612 N.E.2d 550

(Ind. 1993), which held that under the UCC a computer programmer could be held liable

for breach of an implied promise of having the reasonable skill and ability to do the job

for which it contracted.  *Id.* at 319-20.  But the Court finds that based on Missouri's

existing law – which generally limits professional negligence actions to those fields in

which participants are regulated by state licensing requirements – the Missouri Supreme

--------

[14] Monsanto makes a bare attempt to distinguish the cases finding no professional negligence claims against computer consultants because the work SEI was retained to perform was "highly technical" and therefore more complex than "managing an Internet website or providing software, hardware and related installation services."  (Monsanto's Mem. in Opp'n to Mot. to Dismiss at 18-19.)  But the Court concludes that Missouri courts would not find this distinction compelling because none of the courts to reject professional negligence claims in the context of computer professionals did so on the basis that computer work was not complex or highly technical.  Instead, courts rejected the claims on the basis that computer professionals are not subject to the same kinds of licensing requirements and regulations as other professionals.  Whether SEI's work was more or less complex than the designing and maintaining websites or installing new computer systems that was at issue in some of the cases rejecting professional negligence claims is therefore irrelevant to the rationale behind those courts' determinations that such claims were unavailable.

Court would follow the majority of courts that have more recently held that computer professionals are not subject to a higher duty of care based on their profession. Accordingly, the Court will grant SEI's motion to dismiss Monsanto's professional negligence claim.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Superior Edge, Inc.'s Motion to Dismiss [Docket No. 86] is **GRANTED in part** and **DENIED in part** as follows:

1.    The motion is **GRANTED** with respect to Monsanto's counterclaim for Professional Negligence (Count VII).  That claim is **DISMISSED with prejudice.**

2.    The motion is **DENIED** in all other respects.

DATED:   September 8, 2014                    _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                         JOHN R. TUNHEIM
                                                          United States District Judge